**Ethelyn GILBERT et al.,
Plaintiffs-Appellants,**

v.

**W. L. STERRETT, Dallas County
Judge, et al., etc.,
Defendants-Appellees.**

**No. 74–1467.**

United States Court of Appeals,
Fifth Circuit.

March 24, 1975.

Rehearing and Rehearing En Banc
Denied June 16, 1975.

---

Edward B. Cloutman, III, Walter Irvin, John F. Jordan, Dallas, Tex., for plaintiffs-appellants.

Mel Price, pro se.

John Whittington, pro se.

Henry Wade, Dist. Atty., John B. Tolle, Asst. Dist. Atty., Earl Luna, Thomas V. Murto, III, Dallas, Tex., for Sterrett, Tyson, Orr.

Before RIVES, GODBOLD and INGRAHAM, Circuit Judges.

RIVES, Circuit Judge:

This class action, filed on May 5, 1972, challenged the apportionment in 1971 of County Commissioners' precincts or districts of Dallas County, Texas, alleging racial gerrymander or, alternatively, the effect of diluting the vote of black citizens. The named plaintiffs are black voters in Commissioners' Precincts 3 and 4. The defendants are the County Judge and the four County Commissioners. At a pretrial conference on April 16, 1973, it was agreed that the case would be passed until the Commission redistricted itself in August, 1973. A new plan was adopted which plaintiffs alleged failed to cure the defects in the 1971 plan. The case was tried, beginning January 15, 1974. The district court entered its judgment on January 30, 1974, denying relief to the plaintiffs. This appeal ensued.

On appeal the plaintiffs-appellants contend that the district court either applied the wrong standard of law or was clearly erroneous in its findings of fact. We affirm.

The constitutional test actually applied by the district court was stated in its opinion as follows:

"It is well established that to prove the existence of a constitutionally impermissible redisricting [sic] plan in the absence of malapportionment, plaintiffs must show (1) a racially motivated gerrymander, or a plan drawn

along racial lines,[3] *or* (2) the apportion-

3. Wright v. Rockefeller, 376 U.S. 52 [84 S.Ct. 603, 11 L.Ed.2d 512] (1964); Gomillion v. Lightfoot, 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] (1960); Howard v. Adams County Board of Supervisors, 453 F.2d 455 (5th Cir. 1972), cert. denied 407 U.S. 925 [92 S.Ct. 2461, 32 L.Ed.2d 812] (1972).

ment plan would operate to minimize or cancel out the voting strength of racial or political elements of the voting population.[4] An apportionment

4. Burns v. Richardson, 384 U.S. 73 [86 S.Ct. 1286, 16 L.Ed.2d 376] (1966); Howard v. Adams County Board of Supervisors, 453 F.2d 455 (5th Cir. 1972), cert. denied 407 U.S. 925 [92 S.Ct. 2461, 32 L.Ed.2d 812] (1972).

scheme is not constitutionally impermissible merely because its lines are not carefully drawn to ensure representation to sizable racial, ethnic, economic or religious groups.[5]

5. Whitcomb v. Chavis, 403 U.S. 124 [91 S.Ct. 1858, 29 L.Ed.2d 363] (1971)."

(App. p. 102.)

Though stated in different language, that standard of law does not differ materially from the standard as variously stated by this Court in Zimmer v. McKeithen (*en banc*), 5 Cir. 1973, 485 F.2d 1297, 1303; Turner v. McKeithen, 5 Cir. 1973, 490 F.2d 191, 193–197; Moore v. Leflore County Board of Election Commissioners, 5 Cir. 1974, 502 F.2d 621, 623, 624; Robinson v. Commissioners Court, Anderson County, 5 Cir. 1974, 505 F.2d 674.

Dallas County contains several incorporated municipalities, the largest being the City of Dallas. According to the 1970 Census, the population of the County was 1,327,321, of which 72.59% were white, 16.61% black, 6.26% Mexican-American, and 4.54% unknown. Approximately 90% of the black population lived in the City of Dallas and were nearly all concentrated in one part of the City.

The Commissioners' Court is the governing and legislative body for the County, charged with the County's "general operation," with the approval of the budget of county departments and of elected county officials, and with the ap-

pointment of members of the boards of the County Hospital and of the County Welfare Department. The Commissioners' Court is comprised of four commissioners, elected from precincts or districts, and the County Judge, elected from the County-at-large. Historically, the precincts or districts have been formed by dividing the County into quadrants: district one-northwest quadrant, district two-northeast quadrant, district three-southeast quadrant, district four-southwest quadrant. The Commissioners' Court has authority in odd-numbered years to revise boundaries of the districts. Every even-numbered year two commissioners are elected for four-year terms. Commissioners from districts 1 and 3 run in presidential election years, while those from districts 2 and 4 run in other even-numbered years.

In the 1971 plan, the Commissioners' Court satisfied the constitutional requirement of "one man, one vote," but was challenged as being racially discriminatory. Specifically the complaint charged that the north-south boundary line between districts 3 and 4 was a gerrymander which had the effect of removing a square-shaped area, densely populated with black citizens, out of district 3 and placing it in district 4, thus preventing the election of a black resident of district 3 and diluting "the black vote that existed in old Precinct District Three."

In the 1973 plan, the Commissioners' Court substantially straightened the 1971 peculiarly shaped boundary line between districts 3 and 4 without creating inequality of population between the two districts. While the 1971 plan had shifted black voters out of district 3 into district 4, the 1973 plan had the opposite effect. The district court found "[u]nder the 1971 plan, 26.9% of the population in district three and 29.0% in district four were black. Under the 1973 plan 38.6% and 16.9% in districts three and four, respectively, were black. The overall effect of the 1973 plan was to shift approximately one-fourth of the black population from district four to district three." (App. 104.)

The district court found no substantial evidence that the adoption of either plan was racially motivated, and that finding is not seriously contested. Certainly that finding is not clearly erroneous.

The plaintiffs-appellants no longer claim any constitutional infirmity in the 1971 plan. Their expert political analyst testified that, in his opinion, the 1971 plan did not dilute, minimize or cancel out the voting strength of any minority group in district 3 or 4. The 1973 plan is now the target of the attack.

■ In our opinion the district court adequately answered that attack as follows:

"Plaintiffs' contention that the 1973 plan dilutes and cancels out the black vote is principally based on the testimony of political analyst Dan Weiser's projection of black population growth in Dallas County. According to Weiser the 1973 plan assures that there would not be a possibility of a black majority in any commissioner district until 1985. This forecast is based on two assumptions: (1) that 80% of the black growth from the present until 1985 will be in district four, which under the 1973 plan, has 16.9% of the black population and (2) that the total population growth in Dallas County would be uniform in each district so that the county would not have to be reapportioned again until 1985. While there is some probative evidence to support Weiser's first assumption, and no evidence to support the second, this court is of the opinion that an apportionment plan that presently passes constitutional muster but which may dilute black voting strength ten years hence, does not compel a determination that the existing plan is constitutionally impermissible.

"The 1973 plan increased the percentage of black voters in district three from 26.9% to 38.6% when the total black population in Dallas County is 16.6%. Also the percentage of minority voters in district three was increased from 36.6% to 46.5% when the total minority population in Dallas County is 23.5%. Further, the existing black and minority composition in commissioner district three is more favorable to blacks and minorities than Congressional and state senatorial districts located in the Dallas County area.

"This court is of the opinion that the 1973 plan does not dilute the voting strength of black voters. Even assuming that 80% of the black population growth between the present and 1985 will be in district four there is no evidence that the 1973 plan will be the same plan utilized in 1985. The past history of Dallas County reflects that there has not been uniform population growth in the commissioner's [sic] districts and that commissioners court has had to periodically redistrict to satisfy the constitutional requirement of "one-man, one-vote." There has been no showing that uneven population growth among the districts and periodical redistricting will not occur in the future.

"This court is of the opinion that to require the Commissioners Court of Dallas County to reapportion commissioners districts in 1973 based on projected 1985 population statistics is beyond the constitutional mandate of Burns v. Richardson [384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966)], supra. Such a requirement in this case would result in mathmatical [sic] inaccuracies and the adoption of a plan which would presently dilute the voting strength of blacks in the commissioners districts of Dallas County.

"There is no evidence that in the elections to be held in 1974 or 1976 that the 1973 plan would operate to minimize, cancel or dilute the voting strength of black voters. Under the record of this case, any determination as to the constitutional validity of the 1973 plan beyond the 1976 elections would be speculative and conjectural. For the foregoing reasons this court is of the opinion that the 1973 plan is constitutional." (App. 104–106.)

■ It is clear that none of the findings of fact should be set aside as clearly erroneous. See F.R.Civ.P. 52(a). There may, however, be some question as to the sufficiency of the findings, specifically as to whether the district court considered the 1973 plan in the light of the past history of racial discrimination in Dallas County.

This appeal is not from the opinion of the district court but from its judgment.

" . . . the nature of the evidentiary findings sufficient and appropriate to support the court's decision . . . is for the trial court to determine in the first instance in the light of the circumstances of the particular case. We hold . . . that there must be findings, stated either in the court's opinion or separately, which are sufficient to indicate the factual basis for the ultimate conclusion."

Kelley v. Everglades District, 1943, 319 U.S. 415, 422, 63 S.Ct. 1141, 1145, 87 L.Ed. 1485.

Rule 52(b) provides in part that after the entry of judgment a party may move the court to amend its findings or make additional findings. See Wright and Miller, Federal Practice and Procedure: Civil § 2582. It does not appear that such a motion was filed in this case. The text writers emphasize that, in cases tried without a jury there should be no formal barriers to appellate review of the court's findings. See Wright and Miller, *supra*, § 2581; 5 A. Moore's Federal Practice ¶ 52.11[4]. Indeed the Rule itself provides:

> When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the district court an objection to such findings or has made a motion to amend them or a motion for judgment.

Under the circumstances of the present case we attach no significance to the failure of the plaintiffs-appellants, to file a motion in the district court for additional findings.

■ On the other hand, findings "should be construed liberally and found to be in consonance with the judgment, so long as that judgment is supported by evidence in the record." Zimmerman v. Montour Railroad Co., 3 Cir. 1961, 296 F.2d 97, 98; Blumenthal v. United States, 3 Cir. 1962, 306 F.2d 16, 17, 18.

The findings and conclusions themselves are clearly susceptible of the construction that the district court considered the 1973 plan in the light of Dallas County's past history of racial discrimination. The district court specifically ruled that, "This court is of the opinion that the 1973 plan does not dilute the voting strength of black voters." Also in the constitutional test applied by the district court (ante p. 1392) it is recognized that the apportionment plan was subject to attack if it "would operate to minimize or cancel out the voting strength of racial or political elements of the voting population" (language borrowed from Fortson v. Dorsey, 1965, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401). The district court's opinion opted against "the adoption of a plan which would presently dilute the voting strength of blacks in the commissioner's districts of Dallas County." (ante p. 1392.)[1]

The district court took judicial notice of the findings of fact in Graves v. Barnes, 343 F.Supp. 704 (W.D.Tex.1972), aff'd sub nom. White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). Those findings of fact state unequivocally that Blacks in Dallas, Texas, have been subject to blatant discrimination and delimit the most salient aspects of that discrimination as it pertains to the political process. The court also received testimony about racially tinged campaign "dirty tricks," the effect of Black votes on earlier Dallas County elections, and the number of Blacks winning office. We attach as an Appendix

---

1. This court employed a similar analysis in Taylor v. McKeithen, 5th Cir. 1974, 499 F.2d 893, 896, 897.

a list showing the introductions of evidence relevant to past racial discrimination.

██ While the court agreed to consider the evidence only if relevant, the appellant has brought no evidence to this court's attention to show that the district court failed to consider the evidence. From the record as a whole we conclude that the district court's findings were sufficient and were not clearly erroneous.

██ What counsel for plaintiffs-appellants asked on oral argument was a remand with direction that the Commission redistrict itself once more, this time so that the majority of voters in at least one district be Blacks. That would be contrary to the settled rule that "a minority group is not constitutionally entitled to an apportionment structure designed to maximize its political advantage." Turner v. McKeithen, *supra*, 490 F.2d at 197.

We find no reversible error. The judgment is

Affirmed.

## APPENDIX

PAGE

42　Motion for court to take judicial notice of finding of fact in Graves v. Barnes, 343 F.Supp. 704 (W.D.Tex.1972), aff'd. sub nom White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

121(a)

122　Court sustains above motion; took notice of those decisions insofar as they may be relevant. Judge says he has read cases—but not in detail—"insofar as . . . relevant to any issue in this case, the Court will consider those."

211　Cross-examination of Mr. Reed, a former state legislator (late 60's and early 70's), trial judge asks him how many Black legislators were in legislature while Reed served.

PAGE

"Two in each session, or one in each session?"

212　Reed asked about slating and about effect on minority representation of change from multi-member legislative districts to single member districts.

314,　Testimony and statistics
316, 317　(plaintiff's exhibit #36) offered on contested legislative races—involving the Black vote —from 1960 to 1970. Judge overruled objection to receipt of that evidence and evidence contained in plaintiff's exhibit #35. Overruled objection, will consider if relevant.

320　Testimony that in legislative races from 1960 to 1970 Negro votes made no difference in the outcome.

325　Testimony about two Black representatives and multi-member districts.

327　Testimony that it was, and is, possible between 1960 and 1970 for a politician to completely ignore the Negro bloc vote.

393,　Testimony about racial dis-
396　crimination in Dallas, judge overrules an objection thereto.

399　Testimony about racial discrimination finding in Graves v. Barnes case.

335,　Testimony about racist cam-
347　paigning.

348　Testimony that Negro has been precluded from meaningful participation in the candidate selection process.

375　Testimony about "racial campaigning."

392　Testimony about percentages of Blacks in the congressional districts in 1960's and before.

397　Returns of the May 1964 Democratic primary introduced as defendants' exhibit #6; May 1968 returns, defendants' exhibit #5.

PAGE

400–
407 Returns of the 1962 commission race between a Black and White, defendants' trying to show that Blacks did influence the race.

406 Testimony about the 1964 commission race.

412 Testimony to show that Negroes influenced 1970 commissioner's race.

414 Court states that it understands the point that defendants are trying to make. "Any time the difference in candidates [votes] is equal to the number of Negro voters . . . they could have an influence on the election."

\*    \*    \*    \*    \*

"If it equaled the number of Chinese voters, [they] could have an influence on the election."

GODBOLD, Circuit Judge (dissenting):

I agree with the majority that the District Court did not err in holding that the 1973 redistricting plan was not shown to be racially motivated. I am not able to agree that the District Court correctly considered the plaintiffs' alternative theory of "dilution" of the black vote, that is, that redistricting, even if not racially motivated, had the effect of minimizing or cancelling out the voting strength of black citizens.

The District Court's brief discussion of the dilution issue states that the plaintiffs' case was "principally based" on the testimony of a political analyst who projected future black population growth in Dallas County and concluded that in neither district three nor district four would there be a black majority within ten years. Having referred only to this statistical evidence of *future* demography, the District Court concluded: "*There is no evidence* that in the elections to be held in 1974 or 1976 *that the 1973 plan would operate to minimize, cancel or dilute* the voting strength of black voters." [emphasis added.]

A redistricting plan not devised with a discriminatory motive may nevertheless be unconstitutional. The test is whether the plan, combined with a past history of racial discrimination and present political realities, gives minority group members "less opportunity than . . . other residents in the district to participate in the political processes and to elect legislators of their choice," White v. Regester, 412 U.S. 755, 766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973), aff'g in part, rev'g in part Graves v. Barnes, 343 F.Supp. 704, 732 (W.D.Tex., 1972). The rule is a judicial recognition of what common sense commands—that the effect or impact of a redistricting plan cannot be evaluated accurately when considered in isolation but only when examined against the backdrop of racial discrimination in the community, past and present.

We have followed White v. Regester in a series of cases. Turner v. McKeithen, 490 F.2d 191 (CA5, 1973); Moore v. LeFlore County Board of Election Commissioners, 502 F.2d 621 (CA5, 1974); and Robinson v. Commissioners Court, 505 F.2d 674 (CA5, 1974). Cf. Taylor v. McKeithen, 499 F.2d 893 (CA5, 1974); Reese v. Dallas County, Alabama, 505 F.2d 879, (CA5, 1974); and Bradas v. Rapides Parish Police Jury, 508 F.2d 1109 (CA5, 1975). White v. Regester itself was an affirmance of a three-judge district court decision from this circuit originally styled Graves v. Barnes. In its affirmance the Supreme Court relied heavily on the factual history and existent practices of discrimination found by the District Court to exist in Dallas County, Texas, the very geographical area here under consideration. 412 U.S. at 765–769, 93 S.Ct. 2332, 37 L.Ed.2d at 324–325.

The three-judge court in Graves v. Barnes held that "a multi-member [state legislative] district in Dallas County tends to dilute or cancel out the vote of Dallas County's Negro minority," and was therefore unconstitutional. The undergirding facts to which the court gave

weight are set out in 343 F.Supp. at 724–27. They are:

1. The strict "majority" rule that requires a majority vote as a prerequisite to nomination in a primary election.

2. The "place" requirement that limits candidates for legislative office to a specified "place" on the ballot, the ultimate effect of which is to highlight the racial element where it exists.

3. The absence of a provision for at-large candidates running from particular geographical sub-districts.

4. The "rather colorful history of racial segregation" in Texas, consisting of "innumerable instances, covering virtually the entire gamut of human relationships, in which the State has adopted and maintained an official policy of racial discrimination against the Negro."

5. The statistical disproportion between the number of black residents who have been legislators and the number of black ghetto residents.

6. The fact that the black community has been effectively excluded from participation in the Democratic Primary selection process.

7. The exclusion of black community leaders from the affairs of the Dallas Committee for Responsible Government, without whose endorsement it is difficult to secure a legislative seat or the Democratic Primary nomination. The DCRG decides how many black candidates, if any, it will slate, and then requests black leaders to recruit the candidates.

8. Negroes in Dallas County are permitted to enter the political process in a meaningful manner "only through the benevolence of the predominant white majority."

The foregoing constituted the past history and practices, current through 1970, as found by the three-judge district court in 1972. The trial court in the case before us took judicial notice of these findings. There is additional evidence in the record of more recent political conditions in Dallas County, but to an appellate court it is conclusive neither that the pre-1972 conditions have been eliminated nor that they retain sufficient vigor to render the proposed districting plan unconstitutional. Taken as a whole the evidence required the trial court to consider in detail whether the 1973 plan, when judged against the backdrop of the past history of racial discrimination and present conditions, is constitutional. But there is not in its opinion any finding, mention or even hint that the court gave consideration to the combination of past history as reflected in Graves v. Barnes and current practice, as it was required to do. To the contrary, it held—after discussing only the statistics of *future demographic trends*—that there is "no evidence" that the 1973 plan would "minimize, cancel or dilute the voting strength of black voters."

The result is that plaintiffs here have not been given a proper determination under currently recognized standards of whether their voting rights have been diluted by means of the challenged districting plan. I think the case should be sent back to the trial court for proper findings and rulings by the judge who heard all the testimony and evidence.

With deference to my brothers, I do not understand their determination to perpetuate a result at best dubious. Justice will not be harmed by a remand and entry of more precise findings that will dispel the cloud around this decision. The majority opinion seems to me to reveal on its face that the majority are neither confident nor even comfortable with what they have decided. Nor do I understand the methodology of the salvage effort. Judge Rives has searched the record to find illustrations of past and present practices of racial discrimination, including the judicially noticed facts of Graves v. Barnes. Recognizing that this evidence existed and was before the trial court for its consideration and that the court was bound to consider it, the majority opinion then concludes that the plaintiffs have brought no evidence to our attention (at the appellate level) to show that the District Court failed to consider what it was obligated to consider. I have two points in response:

1. One need read only what the District Judge said. After talking of the

future he said "there is no evidence" that the 1973 plan will produce dilution. *There is evidence,* substantial evidence, some of it bearing the stamp of approval of the Supreme Court. The majority's recital of the evidence does not cure the error but more firmly establishes it.[1]

2. General conclusory statements that a burden of proof or standard has been met, *vel non,* are not adequate for judi-

cial review under Rule 52(a), F.R.Civ.P.[2] The requirement of adequate findings does not go to jurisdiction but to our discretion whether "a full understanding of the issues [can] be reached without the aid of [additional] findings."[3] The test is whether the findings provide "a clear understanding of the basis of the trial court's decision [or] whether they are sufficiently comprehensive and perti-

1. It is not our task to determine how the case got into its awkward posture. The most likely possibility seems to me to be that the District Court simply was not aware that a background of racial discrmination had any evidentiary relationship to dilution, but rather viewed dilution as a concept related only to the future. That is, he knew all the facts but considered only part of them to be significant (hence the discussion of future demography and the conclusion that there is "no evidence" of dilution). The trial judge employed the "operate to minimize or cancel out the voting strength" [of minorities] language of Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401, 405 (1963), but cited only Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), and Howard v. Adams County Board of Supervisors, 453 F.2d 455 (CA5, 1972), cert. denied 407 U.S. 925, 92 S.Ct. 2461, 32 L.Ed.2d 812 (1972). Neither of those cases contains any holding on the issue. White v. Regester and Turner v. McKeithen had spelled out the meaning of minimization or dilution. Neither was cited. Of course, the District Judge could not be aware of our more recent decisions defining those terms, *Moore* and *Robinson,* because they were handed down after his decision.

2. The leading case is Kelley v. Everglades Drainage District, 319 U.S. 415, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943), from which Judge Rives quotes. The question there was whether a composition of debts of a bankrupt was "fair, equitable, and for the best interests of the creditors . . .." The Court declined to reach the merits, holding that it must remand for

"findings, in such detail and exactness as the nature of the case permits, of subsidiary facts on which the ultimate conclusion of fairness can rationally be predicated.

"The findings in the present case fall short of that requirement. . . . It may be that adequate evidence as to these matters is in the present record. On that we do not pass, for it is not the function of this court to search the record and analyze the evidence in order to supply findings which the trial court failed to make. Nor do we intimate that findings must be made

on all of the enumerated matters or need be made on no others; the nature of the evidentiary findings sufficient and appropriate to support the court's decision . . . is for the trial court to determine in the first instance in the light of the circumstances of the particular case. We hold only that there must be findings, stated either in the court's opinion or separately, which are sufficient to indicate the factual basis for the ultimate conclusion." (Footnote omitted.)

319 U.S. at 420–422, 63 S.Ct. at 1145, 87 L.Ed. at 1488, 1489. *See also* Hatahley v. United States, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1955), and Schneiderman v. United States, 320 U.S. 118, 129–131, 63 S.Ct. 1333, 87 L.Ed. 1796, 1804–1805 (1943) (dictum). This court has followed the same procedure where the trial court failed to enter findings of fact or provided only general conclusions as to the sufficiency of the evidence. United States v. Rohm & Haas Co., 500 F.2d 167, 176, 177 (CA5, 1974) (findings adequate on one issue, inadequate on another); Ellis Diesel Sales and Service, Inc. v. M/V On Strike, 488 F.2d 1095 (CA5, 1973) (summary vacation of judgment and remand for findings under Rule 52(a)); Acme Boat Rentals, Inc. v. J. Ray McDermott & Co., 407 F.2d 1324 (CA5, 1969) (same); Lettsome v. United States, 434 F.2d 907 (CA5, 1970) (conclusion that plaintiff was not contributorily negligent not adequate); Mladinich v. United States, 371 F.2d 940, 941 (CA5, 1967) (statement that government supported its case with clear and convincing evidence not adequate); Southland Corp. v. Campbell, 358 F.2d 333, 337–338 (CA 5, 1966). *Accord,* O'Neill v. United States, 411 F.2d 139 (CA3, 1969). *See generally* Wright and Miller, Federal Practice and Procedure, §§ 2577 and 2579, and 5A Moore's Federal Practice ¶ 52.06 [2].

3. Davis v. United States, 422 F.2d 1139, 1142 (CA5, 1970). Nor is a distinction drawn between subsidiary and ultimate facts. What the trial court should set out are those facts on which its decision is based and upon which this court probably will have to rule in review. See *Kelley* and *O'Neill, supra,* note 2.

nent to the issues to provide a basis for decision." (Citations omitted.)[4] In the trial court's opinion there is not a single specific reference to any of the facts relating to the dilution theory based on past discrimination and present political realities.[5] It is true that we review judgments, not opinions, but a judgment is no better than the supporting facts properly found and the law properly applied.

This case is a classic illustration of the wisdom of Rule 52(a) requiring findings and of the *Kelley* principle. Here we are, in a case affecting the constitutionally-guaranteed rights of many thousands of black citizens and the political structure of a populous and important county, engaged in a 2–1 difference of view between appellate judges who are forced to try to divine what evidence the trial court considered and whether it had in view the correct governing law. Federal rules and practice intended to make this kind of argument as extinct as the dinosaur.

In our prior decisions we have sought to implement impeccably the mandate of the Supreme Court with respect to "benign" redistricting. This case departs from that tradition. I would reverse the decision and remand to the District Court with instructions to consider the issue of non-discriminatory redistricting in light of the prior history and current political practices and to enter findings accordingly. All will then know whether the chips have fallen where under the law and the facts they should.

4. Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508, 515 (CA5, 1969). *See also* United States v. Northside Realty Associates, 474 F.2d 1164, 1171 (CA5, 1973) (court could not ascertain which facts were relied on or how law was applied, where reliance on one set of facts would have constituted constitutionally impermissible violation of free speech rights), and *cf.* United States v. Johnson, 496 F.2d 1131, 1138, n. 7 (CA5, 1973) (adopts *Gulf King Shrimp* test for adequacy of findings under Rule 23(c), F.R.Crim.P.).

5. The trial court made adequate findings on facts related to the future dilution theory of the plaintiffs' cause of action, while making no reference to facts relating to the alternate

theory, of which the plaintiffs made a record by securing judicial notice of Graves v. Barnes. Rule 52(a) is not satisfied by hit-and-miss findings on parts of the suit. Moreover, both theories concerned what constitutes "dilution" of minority voting rights by means of non-racially motivated districting plans. In light of the fast development and recent uncertainty of the constitutional doctrines involved, it is especially important that the factual bases of these decisions be spelled out with clarity. The circuit courts and the Supreme Court should have concrete, substantial records and findings if they are to rule intelligently and with a sharp eye to reality in this area.