# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 21, 2025

Lyle W. Cayce
Clerk

————————

No. 24-20405

————————

FIRE PROTECTION SERVICE, INCORPORATED,

*Plaintiff—Appellant*,

*versus*

SURVITEC SURVIVAL PRODUCTS, INCORPORATED,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-2162

———————————————————————

Before STEWART, DENNIS, and HAYNES, *Circuit Judges*.

JAMES L. DENNIS, *Circuit Judge*:

This appeal presents a single issue of statutory interpretation: whether life rafts are "Equipment" under the Texas Fair Practices of Equipment Manufacturers, Distributors, Wholesalers, and Dealers Act ("Dealer Act" or "Act"). The district court said no. We REVERSE and REMAND.

I

Survitec Survival Products, Inc. manufactures and distributes marine safety products to maritime, defense, energy, and aviation markets. Fire Protection Service, Inc. ("FPS"), a Texas business, served as a non-

No. 24-20405

exclusive dealer—via oral agreement—for Survitec products. Relevant to this appeal are Survitec's life rafts, each costing upwards of $15,000 and capable of accommodating up to 30 people.



Federal law and binding international treaties require life rafts like those manufactured by Survitec to be installed on navigable vessels across a wide range of industries—including cruise lines, offshore and oil and gas operations, military sealift commands, maritime shipping, merchant marine services, and commercial fishing.[1]

In 2011, amid the parties' ongoing dealership relationship,[2] the Texas Legislature enacted the Dealer Act. Tex. Bus. & Com. Code §§ 57.001–57.402. The Act forbids suppliers from terminating dealer agreements concerning "Equipment" without good cause and imposes an

---

[1] *See, e.g.*, 33 C.F.R. § 144.01-1 (manned offshore drilling platforms); 46 C.F.R. §§ 108.525 (mobile offshore drilling platforms), 133.105 (support vessels for offshore platforms), 28.120 (commercial fishing vessels), 199.261(b)(2) (cargo vessels). Life rafts are also required on various categories of vessels by Chapter 3 of the International Convention for Safety of Life at Sea (1974), to which the United States is a signatory. *See* Exec. Order No. 12,234, *Enforcement of the Convention for the Safety of Life at Sea*, 45 Fed. Reg. 58,801 (Sept. 3, 1980).

[2] In a prior appeal, and upon our certified question, the Supreme Court of Texas held the Act was not unconstitutionally retroactive as applied to the parties' agreement. *See Fire Protection Serv., Inc. v. Survitec Survival Prods., Inc.*, 18 F.4th 802 (5th Cir. 2021) (certifying question); *Fire Protection Serv., Inc. v. Survitec Survival Prods., Inc.*, 649 S.W.3d 197 (Tex. 2022) (answering certified question).

No. 24-20405

obligation on suppliers to repurchase unsold inventory upon termination. *Id.* §§ 57.153, 57.353.

In August 2017, Survitec notified FPS that it was terminating their dealership agreement. Survitec did not cite a specific cause. Nor did it repurchase FPS's unsold inventory. FPS filed suit, alleging that Survitec's conduct violated the Dealer Act. That claim failed when the district court granted Survitec's Federal Rule of Civil Procedure 52(c) motion after a bench trial. The court ruled that, because Survitec's life rafts are not "Equipment" under the Act, the Act does not apply to this case.

## II

When a district court enters a Rule 52(c) order after a bench trial, we review legal conclusions and mixed questions of law and fact de novo and factual findings for clear error. *Eni US Operating Co. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 934 (5th Cir. 2019).

This appeal turns on Texas law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). "[W]e are bound to apply Texas law as interpreted by the state's highest court." *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel, L.L.C.*, 620 F.3d 558, 564 (5th Cir. 2010). When the state's highest court has not spoken on the direct question, federal courts are required to make an "*Erie* guess and determine, in [their] best judgment how [the state's highest court] would resolve the issue if presented with the same case." *Jatera Corp. v. US Bank Nat'l Ass'n*, 917 F.3d 831, 835 (5th Cir. 2019). In doing so, we defer to intermediate state appellate court decisions unless there is persuasive indication that the highest court would decide otherwise. *Id.*

## III

The Dealer Act applies to written or oral agreements governing the sale of "Equipment." Tex. Bus. & Com. Code §§ 57.002(4), .002(7),

3

.151. "Equipment" includes "machinery, equipment, or implements or attachments" that are "used for, or in connection with," a laundry list of overlapping categories: "lawn garden, golf course, landscaping, or grounds maintenance;" "planting, cultivating, irrigating, harvesting, or producing agricultural or forestry products;" "raising, feeding, or tending to livestock, harvesting products from livestock, or any other activity in connection with those activities;" or "industrial, construction, maintenance, mining, or utility activities or applications." *Id.* § 57.002(7)(A)(i)–(iv). The Dealer Act's definition of "Equipment" conspicuously provides only three narrow exceptions of activities—pertaining to motor vehicles, trailers, and all-terrain vehicles, *id.* § 57.002(7)(B)—which underscores the Legislature's intent that the Act apply broadly to counteract "the superior bargaining power of" manufacturers. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 198 (5th Cir. 2003); *see also Hillman v. Maretta*, 569 U.S. 483, 496 (2013) ("[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980))).

To determine whether life rafts are "Equipment" as defined by the Act, we answer two questions seriatim:[3] whether Survitec's life rafts are (A)

---

[3] The threshold question is whether an item qualifies as "machinery, equipment, or implements or attachments" under the Act. Tex. Bus. & Com. Code § 57.002(7)(A). Neither party disputes that Survitec's life rafts qualify as lowercase "e" "equipment" because they easily fit within the common meaning of the word. *See Equipment*, Dictionary.com, https://perma.cc/9WHB-652U (last visited Aug. 21, 2025) (defining "equipment" as "anything kept, furnished, or provided for a specific purpose"); *Equipment*, Brittanica Dictionary, https://perma.cc/6AVM-TVAE (last visited Aug. 21, 2025) (defining "equipment" as "supplies or tools needed for a special purpose"). A life raft serves at least two purposes: first, as a safety precaution, and, second, as a lifesaving measure in the event of an emergency. *See Life Raft*, Brittanica Dictionary, https://perma.cc/BV42-LLE4 (last visited Aug. 21, 2025) (A "life raft"

No. 24-20405

present in a commercial context covered by the Act; and (B) "used . . . in connection with" those commercial activities.[4]

A

On the first question, Survitec concedes that "marine life rafts are often present (or required to be present) when some offshore commercial activities are being performed, such as offshore construction and maintenance." But Survitec still defends the district court's ruling that the statutory categories of "mining" and "industrial activities" do not encompass oil and gas drilling, industrial fishing, or commercial shipping—*i.e.*, other contexts where Survitec's life rafts are present. Considering the "common, ordinary meaning" of "mining" and "industrial activities," we reject the district court's view.

Looking to dictionaries as a guide,[5] the ordinary meaning of "mining" *does* include oil and gas exploration and production, and "Survitec acknowledges that its life rafts are used on offshore oil platforms," confirming that its life rafts are being used in the mineral exploration context. According to one dictionary, "mining" is "the process or business of making or of working mines." *Mining*, Webster's Third New International Dictionary 1438 (2002). "Mines" are excavations

---

is "a small rubber boat designed for saving the lives of people when a larger boat or ship sinks.").

[4] Both parties here opposed certification to the Supreme Court of Texas.

[5] In construing undefined statutory terms, Texas courts begin—and often end—with their "common, ordinary meaning." *Malouf v. State*, 694 S.W.3d 712, 718 (Tex. 2024). Texas courts first look to "dictionary definitions," and then "consider the term's usage in other statutes, court decisions, and similar authorities." *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 34–35 (Tex. 2017). It is only when ordinary meaning is insufficient that Texas courts "resort to extrinsic aids or special rules of construction." *Malouf*, 694 S.W.3d at 718.

"from which mineral substances . . . are taken by digging or by some other method of extraction." *Id.* at 1437 (defining "mine"). "Minerals" are "any of various naturally occurring . . . substances . . . obtained for man's use," including "petroleum" and "natural gas." *Id.* (defining "mineral"). Likewise, *Brittanica Dictionary* defines "mining" as "the process or business of digging in mines to obtain minerals, metals, jewels, etc." *Mining*, BRITTANICA DICTIONARY, https://perma.cc/WWS8-5WWG (last visited Aug. 21, 2025). That dictionary goes on to define "mineral" as "a substance . . . that is naturally formed under the ground." *Minerals*, BRITTANICA DICTIONARY, https://perma.cc/57XA-2ZUA (last visited Aug. 21, 2025). And *Black's Law Dictionary* similarly defines "mining" to specifically "encompass[] oil and gas drilling." *Mining*, BLACK'S LAW DICTIONARY 1189 (12th ed. 2024).

Texas Supreme Court and intermediate appellate court precedents point the same way. More than a century ago, the Texas Supreme Court held that "oil and gas within the ground are minerals." *Tex. Co. v. Daugherty*, 176 S.W. 717, 719 (Tex. 1915). It follows, then, that "'[m]ining' is a generic term which includes the whole mode of obtaining metals and minerals from beneath the surface of the ground," and it is "broad enough to include the process of boring into the ground for the purpose of reaching and extracting oil or gas." *Luse v. Boatman*, 217 S.W.1096, 1100–01 (Tex. App.—Fort Worth 1919, writ ref'd). And long after Texas became an oil and gas hub, the Texas Supreme Court adopted *Luse*'s reasoning and held it "well settled that an oil or gas well is a mine." *Southland Royalty Co. v. Pan Am. Petrol. Corp.*, 378 S.W.2d 50, 55–56 (Tex. 1964). So, in Texas, "mining" has always included oil and gas extraction.

The district court offered no contrary plain-meaning analysis. Instead, the court noted that the Texas Legislature has occasionally distinguished between "mining" and "oil and gas" operations in other, unrelated contexts.

We conclude that the district court erred in disregarding the copious authorities establishing that the ordinary meaning of "mining" includes oil and gas exploration and production.

Further still, Survitec's life rafts are present in "industrial activities," like commercial fishing and shipping, too. Dictionary definitions of "industrial" and "industry" focus on systematized capital- and labor-intensive work, of which manufacturing is a key but non-exclusive example. *See, e.g.*, *Industry*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1155–56 (2002) ("systematic labor esp. for the creation of value"; "a division of productive or profit-making labor," especially "one that employs a large personnel and capital esp. in manufacturing"); *Business*, BRYAN GARNER, DICTIONARY OF MODERN LEGAL USAGE 126 (5th ed. 2022) ("Industry refers mainly to the activities of those engaged in manufacture and production, the construction of buildings, and ventures involving major labor and massive capital."); *Industrial*, BRYAN GARNER, MODERN ENGLISH USAGE 462 (3d ed. 2009) ("industrial typically refers to manufacturing activities or productive enterprises"); *Industry*, BLACK'S LAW DICTIONARY 924 (12th ed. 2024) ("Systematic labor for some useful purpose; esp. work in manufacturing or production."); *Industrial*, OXFORD ENGLISH DICTIONARY, https://perma.cc/JJ5R-S8ZM (last visited Aug. 21, 2025) ("Of or relating to productive work, trade, or manufacture, esp. mechanical industry or large-scale manufacturing.").

The common thread through these definitions is that "industrial activity" is activity involving large-scale, systematic, labor- and capital-intensive economic endeavors. *See City of Fort Worth v. Pridgen*, 653 S.W.3d 176, 183–84 (Tex. 2022) (holding that, to find ordinary meaning, courts should not "arbitrarily choose between" various dictionary definitions but should search for the "common thread throughout" several dictionary definitions). As the district court acknowledged, Texas courts have

accordingly interpreted the term broadly. *See, e.g.*, *SWEPI LP v. R.R. Comm'n of Tex.*, 314 S.W.3d 253, 266 (Tex. App.—Austin 2010, pet. denied) (finding that a landfill is an "industrial use" under Chapter 92 of the Texas Natural Resources Code); *Calvert v. Austin Laundry & Dry Cleaning Co.*, 365 S.W.2d 232, 235 (Tex. App.—Austin 1963, writ ref'd n.r.e.) (observing that courts have held dry cleaning and newspaper printing to be "industrial" operations).

Under this common meaning, oil and gas operations, global shipping, and commercial fishing are undoubtedly "industrial activities" because each involves systematized, large-scale, labor- and capital-intensive operations that rely heavily on mechanized processes and heavy machinery. *See, e.g.*, *Stockport Mountain Corp. v. Norcross Wildlife Found., Inc.*, No. 3:11-CV-514, 2013 WL 4538822, at *11 (M.D. Pa. Aug. 27, 2013) (adopting definition of "industrial" that focused on the use of "systematic labor especially for some useful purpose or the creation of something of value").

Nor are we persuaded by the district court's concern that if "industrial" referred "generally to large-scale commercial activity," then "[t]he landscaping, agricultural, and livestock purposes discussed in subsections (A)(i), (ii), and (iii) of the Act could likewise be 'industrial' purposes under the broad definition of that word." True enough, "[w]hen possible," the Texas Supreme Court attempts to construe a statute's "language in a way that does not render any of it meaningless." *Malouf*, 694 S.W.3d at 718. But that is not always possible, and the canon should be cautiously applied because legislatures frequently employ redundant language to prevent gaps in statutory coverage. *See In re Est. of Nash*, 220 S.W.3d 914, 918 (Tex. 2007) (explaining that "there are times when redundancies are precisely what the Legislature intended," "out of an abundance of caution, for emphasis, or both" (citation and internal quotation

marks omitted)). Context will usually show when this was the drafters' intent.

Here, the context establishes the Texas Legislature's intent. Several subsections of the Dealer Act's "Equipment" definition use overlapping categories and multiple iterations describing the same industry to ensure breadth: lawn, garden, landscaping, and ground maintenance; harvesting and producing agricultural or livestock products; and raising, feeding, and tending to livestock. Tex. Bus. & Com. Code § 57.002(7). The Texas Legislature's desire for broad application is also apparent in its statement that the Dealer Act covers equipment and attachments used for or "in connection with" any category in the litany of broadly worded fields. The district court should have been guided by the Legislature's unmistakable intent to craft a broad statute. *See Sayre v. Mullins*, 681 S.W.2d 25, 27 (Tex. 1984) (meaning of statutory provisions must be ascertained considering statutory scheme as a whole). And given that intent, we adopt the ordinary meaning of "industrial activities." *See, e.g.*, *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 66 (Tex. 2015) (adopting ordinary meaning even though it might result in "overlap between 'in part' and the neighboring statutory language"); *accord Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019) ("Sometimes the better overall reading of the statute contains some redundancy.").

For these reasons, we find that Survitec's life rafts are included in four commercial contexts covered by the Act: construction, maintenance, mining, and industrial. Tex. Bus. & Com. Code § 57.002(7).

B

The second issue is whether life rafts are "used . . . in connection with" those commercial activities. The Dealer Act's use of the phrase "in connection with" is particularly expansive, *Branch L. Firm L.L.P. v. Osborn*, 532 S.W.3d 1, 19–20 (Tex. App.—Houston [14th Dist.] 2016, pet. denied),

and Texas Supreme Court caselaw is clear that the term cannot "imply more than a tangential connection" unless the statute's text constricts its ordinary meaning, *Hegar v. Gulf Copper Mfg. Corp.*, 601 S.W.3d 668, 675–76 (Tex. 2020).[6]

The ordinary meaning of "in connection with" leads us to conclude that Survitec's life rafts are "Equipment" because they have, at the very least, a tangential relationship to construction, maintenance, mining, and industrial contexts. *Id.* Specifically, it is undisputed that the rafts Survitec distributes are legally required equipment for offshore oil and gas platforms, mobile maritime oil and gas drilling vessels, commercial fishing vessels, and the massive cargo ships that carry most of the world's commerce. *Supra* note 1.

To overcome this commonsense conclusion, Survitec invokes *Aleman v. Texas Medical Board*, 573 S.W.3d 797 (Tex. 2019), which interpreted the phrase "connected with." *Aleman* provides Survitec no succor. There, the court gave limited breadth to the phrase "connected with" because of an explicit limitation found elsewhere in the statute's text. The at-issue statute in *Aleman* permitted sanctions against physicians for "unprofessional or dishonorable conduct likely to deceive or defraud the public." Tex. Occ.

---

[6] The district court relied on *Titan Transportation, LP v. Combs*, 433 S.W.3d 625, 639 (Tex. App.—Austin 2014, pet. denied), construing "in connection with" to require "some reasonable nexus" between the equipment and the activity identified by the statute. Survitec neither cites nor defends the district court's reliance on *Titan*, a 2014 intermediate appellate decision that itself cited no Texas Supreme Court authority construing the phrase. In the decades since *Titan*, the Texas Supreme Court has interpreted "in connection with" at least five times—never adopting *Titan*'s "some reasonable nexus" requirement. *McLane Champions, LLC v. Hous. Baseball Partners, LLC*, 671 S.W.3d 907, 916 (Tex. 2023); *Hegar*, 601 S.W.3d at 675–76; *Tarrant County v. Bonner*, 574 S.W.3d 893, 898 (Tex. 2019); *Aleman*, 573 S.W.3d at 804–05; *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 901 (Tex. 2017). Moreover, there is a reasonable and obvious nexus between the lifesaving life raft equipment and the activities identified by the statute.

CODE ANN. § 164.053(a). Such conduct was defined to include eight types of activity that plainly "f[ell] under the umbrella of" deceit or fraud, *Aleman*, 573 S.W.3d at 804, along with a catchall category that encompassed other violations of law "connected with the physician's practice of medicine," TEX. OCC. CODE ANN. § 164.053(a)(1). Applying the statute's "unambiguous parameters," the Texas Supreme Court merely held that this catchall provision was likewise limited to conduct "connected with the practice of medicine in a manner that makes it likely to deceive or defraud the public." *Aleman*, 573 S.W.3d at 804–05. In other words, "connected with" could not stretch the statute's reach beyond what was allowed by another limiting phrase found in the text itself. Here, by contrast, nothing in the Dealer Act's definition of "Equipment" constricts the plain meaning of "in connection with."

Survitec counters that the word "used" itself "mandates a functional connection between the item in question and an enumerated activity." But Survitec's argument ignores the various definitions of "use," which indicate that an item is "used" if it is employed for any purpose. *See, e.g.*, *Used*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2524 (2002) (defining "used" as "employed in accomplishing something"); *Use*, CAMBRIDGE DICTIONARY, https://perma.cc/Q2UK-H2RN (last visited Aug. 21, 2025) (defining "use" as "to put something such as a tool, skill, or building to a particular purpose"); *Use*, BRITTANICA DICTIONARY, https://perma.cc/8KH4-Z59A (last visited Aug. 21, 2025) (defining "use" as "to do something with . . . an object, machine, person, method, etc. . . . in order to accomplish a task, do an activity, etc."). The word "used" alone therefore cannot illuminate the level of connection the Dealer Act's definition of "Equipment" requires. Instead, we are satisfied that the Texas Legislature relied on other words to specify the necessary link: items used "for or in connection with" the specified contexts.

No. 24-20405

At bottom, the term "in connection with" in the Dealer Act does not "imply more than a tangential connection." *Hegar*, 601 S.W.3d at 675–76. And because the at-issue life rafts are legally mandated in the construction, maintenance, mining, and industrial contexts, they certainly clear the low "tangential connection" bar and qualify as "Equipment" under the Act.[7]

## IV

For the foregoing reasons, we REVERSE the district court's judgment and REMAND for further proceedings not inconsistent with this opinion.

---

[7] Survitec's proposed alternative grounds for affirmance fare no better. *First*, the district court correctly rejected Survitec's view that the Act contains a terrestrial boundary, thus excluding all maritime industries. Many of the Act's commercial activities plainly encompass maritime activity, and Survitec identifies nothing in the Act's text to suggest otherwise. The legislative history Survitec relies on to buttress its terrestrial boundary argument is a declaration it procured from a lobbyist-advocate, which is "certainly not sufficient indicia of legislative intent." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 215 (5th Cir. 2019). *Second*, the district court also correctly rejected Survitec's concern that this construction of the Dealer Act conflicts with the Texas Boat Act, as the Boat Act expressly excludes from its scope agreements involving the sale of life rafts. TEX. OCC. CODE ANN. § 2352.001(1); *see also id.* § 2352.051; *id.* § 2352.001(2), (6) (incorporating definition of "boat" in TEX. PARKS & WILD. CODE ANN. § 31.003(3)).