Jennifer **EVANS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–05–00753–CR.

Court of Appeals of Texas, San Antonio.

Dec. 27, 2006.

Rehearing Overruled Jan. 29, 2007.

Discretionary Review Refused May 9, 2007.

---

Angela J. Moore, Chief Public Defender, San Antonio, for appellant.

Scott Roberts, Asst. Crim. Dist. Atty., San Antonio, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice.

## OPINION

Opinion by SARAH B. DUNCAN, Justice.

Jennifer Evans appeals the trial court's judgment convicting her of theft by coercion. Because there is legally insufficient evidence that Evans obtained her clients' money and property by "coercion," as that term is statutorily defined, we are constrained to reverse the trial court's judgment and render a judgment of acquittal.

### STANDARD OF REVIEW

In evaluating whether the evidence is legally sufficient to support the jury's finding that Evans committed theft by coercion, we view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found theft by coercion beyond a reasonable doubt. *See Simmons v. State*, 109 S.W.3d 469, 472 (Tex.Crim.App.2003) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

### FACTUAL AND PROCEDURAL BACKGROUND

Jennifer Evans, who represents herself to be "a spiritual healer, psychic, and card reader," was charged with aggregated theft by coercion of over $200,000, collectively, from Connie Barrientes, Susan Kelly, Gregory Reiter, Yvonne Villareal, Sarah Deaver, Colleen Matsuura, Gloria Jimenez, Janette Rendon, and Shante Smith. Evans's modus operandi is exemplified by the case of Shante Smith, a young CitiBank teller who met Evans in November 2003. According to Smith, after Evans shuffled and laid out the tarot cards, she told Smith she saw death, someone near her-probably a young gentleman-who was going to die of colon cancer, which was spreading. Evans told Smith that to relieve this man of cancer, it would cost $900. When Smith exclaimed that she did not have that much money, Evans asked how much she had. Smith told her around $500 and was told to go to the automatic teller machine across the street and withdraw what she could to put towards the $900. Smith did as she was told, withdrawing $400 from her checking account, and returned to Evans's place of business. Evans took the money and put it in a white box, saying she would pray over it and call Smith the next morning after she had looked further into her case. The next morning, Evans told Smith her case was very serious and she needed to come over as quickly as possible. When Smith arrived, Evans told her the cancer was very serious and spreading rapidly, so it would take more than $900. Evans then began to question Smith regarding how much credit Smith had available on her credit cards. When Smith told Evans what credit cards she had and their limits, Evans handed her a corded phone so she could immediately call for line increases. After Smith was unable to obtain line increases, Evans gave her a list of stores and instructed her to submit credit applications to them. If Smith was successful, Evans told her to

get gift cards for the full amount and give them to Evans. This was necessary, Evans said, to reimburse "the church" for the money Evans had borrowed to pay for two statutes (representing Smith and her boyfriend) Evans had, without Smith's permission, ordered from Brazil, paid for, and had shipped to San Antonio on Smith's behalf. Once these statutes were dressed in nice clothes, Evans said, she would pray over them. At Evans's urging, Smith obtained and gave to Evans $1100 off her major credit cards, a $600–700 gift card from Saks, an $800 gift card from Zales, and a $750 gift card from Sears. Evans then had Smith call banks trying to secure a short term loan. During these calls, Evans would get on the line and explain that she was Smith's sister or cousin, someone in the family had died, and they needed a $15,000–$20,000 loan for traveling expenses and miscellaneous. The only loan Smith was able to obtain in this manner was a $1000 loan from her own bank. Evans then instructed Smith to try to obtain loans from a list of smaller loan and finance companies. In this manner, Smith was able to obtain around $2000. Each day Evans would set Smith a financial goal. By early December 2003, Smith was giving Evans virtually all of her paychecks, so there was none left over to make Smith's car payments. Whenever Smith would ask Evans about the money, Evans would tell her to wait because Smith was going to win the lottery at the end of the year. On days when Smith failed to bring Evans money, Evans would call and inquire, telling Smith she was taking the cancer out of Smith's boyfriend and putting in herself; and it was now spreading or she had found blood in her stool and was going to die and asking if Smith was going to take care of her children. So absorbed was she in getting money for Evans, Smith quit her job. Once Smith's money and ability to get money ran out, Evans stopped calling and frequently refused to take Smith's calls. Ultimately, near the end of February 2004, Smith told her parents and called the police. By then, Smith had given Evans over $13,978.78. Smith testified she gave Evans the money because she "felt pressured" and "had no choice" because Evans "pressured" and "bullied" her.

### DISCUSSION

Evans first argues the evidence is legally insufficient to support the jury's finding that she coerced her clients to part with their money. We agree.

A person commits theft if she appropriates property with the intent to deprive the owner of property and without the owner's effective consent. TEX. PEN.CODE ANN. § 31.03(a), (b)(1) (Vernon Supp.2006). Consent is not effective if it is induced by coercion. *Id.* § 31.01(3)(A). When, as here, a public servant is not involved, coercion is statutorily defined as follows:

"Coercion" means a threat, however communicated:

  (A) to commit an offense;

  (B) to inflict bodily injury in the future on the person threatened or another;

  (C) to accuse a person of any offense;

  (D) to expose a person to hatred, contempt, or ridicule; [or]

  (E) to harm the credit or business repute of any person; or . . .

*Id.* § 1.07(a)(9)(A)-(E).[1] Each statutory definition of coercion thus requires that

---

**1.** For reasons not disclosed in the record, the State chose not to charge Evans with theft by deception. *See* TEX. PEN.CODE ANN.

§§ 31.03(a), (b)(1); 31.03(1), (3)(a) (Vernon Supp.2006); *Johnson v. State,* 187 S.W.3d

the defendant threaten to take some affirmative act: commit, accuse, inflict, expose, or harm. Here, there is no evidence Evans threatened to take any affirmative act; rather, as the State recognizes, she threatened to not act and thus "allow" the harm she purported to foretell to run its course. As the State argues "[t]he threat was simple: Come up with the money that I demand or I won't say the special prayers and your loved one will die."

Evans's clients testified that she claimed bad fortune would befall their loved ones or her if they did not follow her instructions, which invariably included handing over money, merchandise, and gift cards to Evans and some of her relatives; and she harassed her clients until some of them had cleared their bank accounts and were far over their heads in loan and credit card debt. However, even when viewed in the light most favorable to the verdict, Evans's actions do not fall within a statutory definition of coercion. Evans never communicated to her clients in any manner a threat to commit an offense against them or their loved ones. The conduct that most approximates this definition of coercion was Evans telling one of her client's that some of the money for his loved one's cure was being fronted by a Mafioso-type man, which the customer found intimidating. However, this same client admitted on cross-examination that Evans did not threaten to commit an offense against him. And, although Evans told her clients that their loves ones had cancer, were about to get cancer, or were generally in harm's way, she never told them she was going to inflict cancer or harm upon them. Indeed, she never threatened to inflict bodily injury in the future on anyone. Evans never accused a person of any offense. And, despite the State's argument to the contrary, Evans never threatened to expose her customers or others to hatred, contempt, or ridicule. In fact, she told her clients to keep their relationship a secret.

### CONCLUSION

Because there is no evidence that Evans's actions fall within a statutory definition of coercion, we must reverse the trial court's judgment and render a judgment of acquittal.

591 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd).