# United States Court of Appeals
# for the Fifth Circuit

————————

No. 21-40718

————————

United States Court of Appeals
Fifth Circuit

**FILED**

October 17, 2025

Lyle W. Cayce
Clerk

IN THE MATTER OF CAROL ALISON RAMSAY ROSE,

*Debtor*,

CAROL ROSE; CAROL ROSE, INCORPORATED,

*Appellees*,

*versus*

LORI AARON; PHILLIP AARON; AARON RANCH; JAY
MCLAUGHLIN

*Appellants*.

————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 4:19-CV-103, 4:19-CV-98

————————————————

Before ELROD, *Chief Judge*, and RICHMAN and OLDHAM, *Circuit Judges*.

PRISCILLA RICHMAN, *Circuit Judge*:

Carol Rose entered into an agreement with Lori and Philip Aaron (the Aarons) under which the Aarons would buy some of Rose's horses at an upcoming auction and lease her Gainesville Ranch, and Rose would provide consulting services to the Aarons. At the auction, Rose sold many of her

horses to the Aarons, and she sold others to Elizabeth Weston and her company Equis Equine, LLC (the Weston Parties). The parties' dealings gave rise to a flurry of state-court litigation: Rose and the Aarons sued each other, and the Weston Parties sued Rose and the Aarons alleging that the Rose–Aaron deal infected the auction with fraud.

Four years after the original agreement between Rose and the Aarons was consummated, Rose and her company, Carol Rose, Inc., (the Rose Parties) filed bankruptcy petitions. The pending litigation was removed to the bankruptcy court. In the bankruptcy proceeding, the Weston Parties sought to equitably subordinate the Aarons' claims. Additionally, Jay McLaughlin, who had worked as Rose's horse trainer and was involved in the Aaron litigation, filed a proof of claim against the Rose bankruptcy estate.

As relevant here, after a trial, the bankruptcy court held in favor of the Aarons on two issues in the Aaron litigation; awarded McLaughlin a judgment on his claim; held in favor of the Weston Parties on four issues in the Weston litigation; and declined to equitably subordinate the Weston claims to the Aarons' claims. The parties appealed to the district court, which reversed both holdings in favor of the Aarons; reversed the judgment in favor of McLaughlin; affirmed the four holdings in favor of the Weston Parties; and affirmed the denial of equitable subordination. The parties then appealed to this court.

Since then, the Rose Parties and Weston Parties have settled their dispute. The Weston Parties moved to dismiss their cross-appeal, which raised only the equitable subordination issue. We granted that motion. The Rose Parties have moved to dismiss their appeal of the district court's judgment in favor of the Weston Parties. We now grant that motion.

That leaves the two issues from the Aarons' litigation as well as the McLaughlin judgment. We affirm in part and reverse in part the district court's judgment, which reversed the bankruptcy court on these issues.

**I**

Carol Rose is a well-known breeder, owner, and competitor in the American Quarter Horse industry. She began operating her business in Gainesville, Texas, in 1968 (Gainesville Ranch). Beginning in 2009, Rose employed Jay McLaughlin as her horse trainer at Gainesville Ranch. McLaughlin also showed Rose's horses at competitions, and Rose paid McLaughlin a portion of any winnings. In April 2013, Rose decided to hold a dispersal sale of horses, tack, and equipment. The sale occurred August 15-17, 2013.

Lori and Philip Aaron own a ranch in Commerce, Texas (Commerce Ranch). The Aarons met Rose in the spring of 2013. Prior to meeting Rose, the Aarons bred and raised horses at Commerce Ranch. However, unlike Rose, the Aarons did not breed or show performance quarter horses, although the Aarons had purchased quarter horses from other sellers before Rose.

During the summer of 2013, Rose and the Aarons negotiated an arrangement by which, as the bankruptcy court put it, "the Aarons could take [Rose's] place in the performance quarter horse industry." The parties executed three documents in August 2013 memorializing their transactions: a lease with purchase option agreement, a consulting agreement, and a confidential term sheet. The bankruptcy court found that "the parties intended them to work together as a single, unified instrument."

Under the lease with purchase option agreement, the Aarons would lease Rose's Gainesville Ranch for five years for a total of $2.5 million paid in monthly installments. The Aarons would also pay for insurance, utilities,

taxes, and maintenance. The agreement gave the Aarons the right to purchase Gainesville Ranch at the end of the five-year period, with seventy percent of the rent payments counting as a down payment.

Under the consulting agreement, Rose would continue to work at and manage Gainesville Ranch. The agreement stated that the consideration for Rose's consulting services was "[a]ccess to and use of" the personal residence, business spaces, and vehicles at Gainesville Ranch; training and boarding for a limited number of horses; and commissions on sales of horses owned by Gainesville Ranch. The Aarons also continued to employ McLaughlin.

The confidential term sheet summarized the parties' deal. It also identified two subsets of Rose's horses that would be available at her upcoming dispersal sale. One subset, known as the Blue List, contained the names of thirty-nine horses that the Aarons had agreed to purchase from Rose for $3,315,000. The confidential term sheet required the Aarons to bid on the Blue List horses at the dispersal sale. The second subset, known as the Red List, identified fifteen additional horses. The Aarons were not required to purchase or bid on these horses, but Rose thought they would be "good buys" for the listed prices. Rose and the Aarons signed the confidential term sheet ten days before the auction. At the auction, the Aarons were the final bidder on thirty-eight of the thirty-nine Blue List horses and eleven Red List horses.

After the sale, the business relationship between Rose and the Aarons quickly deteriorated. The bankruptcy court made extensive findings of fact, on which we base the discussion of the record. The Aarons did not obtain insurance or transfer utilities, did not provide sufficient funds to cover expenses, and belittled Rose. For her part, Rose "was abusive to a long-time customer," attempted to "sabotage" McLaughlin's horse show

performance, and secretly boarded additional horses at Gainesville Ranch for herself and her friends. As the bankruptcy court put it, "[b]oth parties teetered on the edge of breach and repudiation of the Agreements at different times during August and September 2013."

Things came to a head in early October. On October 3, Rose sued the Aarons in Texas state court and locked the gates that led to the horse barns at Gainesville Ranch. On October 7, the Aarons attempted to visit Gainesville Ranch but discovered an armed security guard standing beside the locked gates to the Ranch. On October 17, Rose's lawyer sent a letter to the Aarons' lawyer asserting a stable keeper's lien in the amount of $101,948.50. Under Texas law, "[a] stable keeper with whom an animal is left for care has a lien on the animal for the amount of the charges for the care."[1] The letter stated that Rose would release the Aarons' horses when they paid the full amount. Rose admits that only $40,691.18 of this bill was related to the care of the Aarons' horses, with the remaining $61,257.32 representing unrelated charges. The Aarons paid the full $101,948.50 on the same day Rose asserted the lien and removed their horses from Gainesville Ranch. The Aarons only made three monthly lease payments for the Gainesville Ranch, which the district court determined left about $2,375,000 in payments remaining on the five-year lease.

Due to the issues between Rose and the Aarons, the Aarons had begun looking at other facilities to lease by the end of September. However, they chose to improve their existing Commerce Ranch at a cost of at least $1.1 million rather than lease a different ranch. McLaughlin testified that the improvements were necessary for the Commerce Ranch to be suitable for high-end performance quarter horses. The Aarons paid for the

---

[1] TEX. PROP. CODE § 70.003(a).

5

improvements through their partnership entity, Broken Arrow Cattle Company LLP, although the district court concluded that "every 'penny that the Aarons spent . . . came from their 'pockets.'" These improvements occurred over a "couple of years."

Rose and the Aarons continued to litigate the state-court lawsuit Rose had filed in October 2013, with the Aarons asserting various counterclaims—including, as relevant here, a breach of contract claim and a violation of the Texas Theft Liability Act (TTLA).[2]  In July 2014, Rose separately sued McLaughlin in state court, and that case was consolidated with the Aaron litigation in September 2015.

In September 2017, the Rose Parties filed bankruptcy petitions, and Rose removed the pending state-court litigation to the bankruptcy court, commencing an adversary proceeding. The Aarons and McLaughlin filed proofs of claims against the Rose bankruptcy estate. McLaughlin's claim, as relevant here, related to Rose's alleged failure to provide American Quarter Horse Association Breeder's Certificates for two fillies, causing the fillies to decrease in value by an alleged $51,200. The bankruptcy court consolidated the adversary proceeding and claim objections for trial, which occurred over nine days in May and June 2018.

The bankruptcy court found in favor of the Aarons on their breach of contract and TTLA claims, as well as in favor of McLaughlin on his claim related to the fillies. The bankruptcy court concluded that "Rose breached the Agreements by locking out the Aarons before the time for the Aarons to cure their alleged breaches had expired under the terms of the Lease" and awarded the Aarons $1,109,000 in damages for their improvements to Commerce Ranch. The bankruptcy court also held that Rose violated the

---

[2] *See* TEX. CIV. PRAC. & REM. CODE § 134.003 (TTLA statute).

TTLA when she extracted the additional $61,257.32 from the Aarons under the stable keeper's lien, a sum which was unrelated to the care of their horses. The bankruptcy court awarded TTLA damages of $61,257.32. The bankruptcy court also awarded the Aarons their reasonable attorneys' fees and costs. Rose appealed the bankruptcy court's judgment to the district court pursuant to 28 U.S.C. § 158(a). The district court reversed the bankruptcy court's judgment as to the Aarons' two claims and McLaughlin's claim and vacated the attorneys' fees award.

The Aarons and McLaughlin timely appealed the district court's judgment to this court under 28 U.S.C. § 158(d). In this posture, we "review[] the decision of a district court, sitting as an appellate court, by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court."[3] "Although we may 'benefit from the district court's analysis of the issues presented, the amount of persuasive weight, if any, to be accorded the district court's conclusions is entirely subject to our discretion.'"[4] "Our review is properly focused on the actions of the bankruptcy court."[5]

## II

Rose and the Aarons dispute the bankruptcy court's damages award on the Aarons' breach of contract claim. We agree with the district court that the damages award must be reversed because the award and its supporting evidence do not reflect any legal measure of damages under Texas law.

---

[3] *In re Renaissance Hosp. Grand Prairie, Inc.*, 713 F.3d 285, 294 (5th Cir. 2013) (quoting *In re Gerhardt*, 348 F.3d 89, 91 (5th Cir. 2003)).

[4] *In re Age Refin., Inc.*, 801 F.3d 530, 538 (5th Cir. 2015) (quoting *In re CPDC, Inc.*, 337 F.3d 436, 441 (5th Cir. 2003)).

[5] *Id.* (citing *In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003)).

## A

The bankruptcy court determined that Rose breached her contract with the Aarons. As damages, the Aarons sought (1) the difference between the price they paid for some of the horses and an appraised value and (2) "a portion of what they spent for the improvements to their ranch in Commerce." The bankruptcy court rejected damages for the price paid for the horses but found that the "Aarons presented sufficient and credible evidence establishing that they paid at least $1,109,000.00 for improvements" to their Commerce Ranch. The court reasoned that "[b]ut for Rose's breach of the Agreements, the Aarons would not have needed to improve" their Commerce Ranch "to accommodate the performance quarter horses they had purchased from Rose" and that "[t]he improvements they made . . . were reasonable and necessary to accommodate the horses and to continue the breeding program they had planned to conduct at the Gainesville Ranch."

Rose argued "that her termination of the Lease benefitted the Aarons in an amount that exceeds what they are seeking for improvements" because the Aarons did not have to pay the outstanding rent—approximately $2,375,000—over the remainder of the five-year lease. The bankruptcy court disagreed, reasoning that Rose's argument did "not account for the impact that Rose's termination of the Lease had on the Aarons." The court stated:

> The termination of the Lease meant that the Aarons did not have the use of the Gainesville Ranch. If the Lease had not been terminated, the Aarons would have had the use of the Gainesville Ranch for their new performance quarter horse business for five years as well as the use of the [Commerce Ranch] for their existing business. Rose's termination of the Lease resulted in the Aarons moving the performance quarter horse business to the [Commerce] Ranch, which necessarily

No. 21-40718

limits their ability to use the [Commerce] Ranch for other purposes. Rose's termination of the Lease also forced the Aarons to spend large sums of money right away rather than spreading out payments over five years.

Accordingly, the court awarded "damages for breach of the Lease in the amount of $1,109,000." The district court reversed, holding that "the bankruptcy court failed to apply an appropriate measure of damages."

## B

The parties dispute the standard of review we should apply. However, we have stated that a "damages award is a finding of fact, which this court reviews for clear error," and "[t]he conclusions of law underlying the award are reviewed de novo."[6] When an "appeal presents purely legal questions concerning . . . the validity of various damages measures, our review is de novo."[7] Accordingly, we review de novo whether the bankruptcy court applied a valid theory of damages.[8]

Under Texas law, "[d]amages must be measured by a legal standard, and that standard must be used to guide the fact-finder in determining what

---

[6] *Eni US Operating Co. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 941 (5th Cir. 2019) (italics omitted) (quoting *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006)); *see also Nat'l Hisp. Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 552 (5th Cir. 2005).

[7] *Hoffman v. L&M Arts*, 838 F.3d 568, 581 (5th Cir. 2016) (italics omitted).

[8] *See also Saulsberry v. Ross*, 485 S.W.3d 35, 51 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("Whether the trial court applied the proper measure of damages is a question of law, which we review de novo."); *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ("The proper measure of damages is a question of law for the court . . . ."); *Turner v. PV Int'l. Corp.*, 765 S.W.2d 455, 465 (Tex. App.—Dallas 1988) ("In any given case, the measure of damages is a question of law."), *writ denied*, 778 S.W.2d 865 (Tex. 1989).

sum would compensate the injured party."[9]  "Damages for breach of contract protect three interests: a restitution interest, a reliance interest, and an expectation interest."[10]  Accordingly, for the damages award to be upheld, it must legally constitute reliance, restitution, or expectancy damages.[11]

The bankruptcy court did not specify what measure of damages it applied.  The district court observed that the bankruptcy court's analysis was "consistent with" the expectation measure, but considered whether to uphold the award under any of the three measures.  The district court held that "the bankruptcy court failed to apply an appropriate measure of damages."  Reviewing "the actions of the bankruptcy court,"[12] we conclude that the bankruptcy court's damages award does not, as a matter of law, reflect a recognized damages methodology under Texas law.  Like the district court, we consider each measure in turn.

## C

The damages award cannot be upheld as restitution damages.  "[R]estitution damages restore to the plaintiff a benefit that it had conferred

---

[9] *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 148 (Tex. App.—Dallas 2012, no pet.); *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90 (Tex. 1973) (same); *see also Wilgus v. Bond*, 730 S.W.2d 670, 672 (Tex. 1987) ("[D]amages must be measured by a legal standard which serves to guide the [fact-finder] in determining compensation for the injured party.").

[10] *Sharifi*, 370 S.W.3d at 148 (quoting *Chung v. Lee*, 193 S.W.3d 729, 733 (Tex. App.—Dallas 2006, pet. denied)); *see also Hoffman*, 838 F.3d at 585; *Atrium Med. Ctr., LP v. Hou. Red C LLC*, 595 S.W.3d 188, 193 (Tex. 2020).

[11] *See Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 567 (Tex. 2002) ("To allow a recovery to stand without evidence of a measure of damages would risk an over-recovery or an under-recovery by a factor that would be intolerable if the verdict were not for a relatively small amount.  The law provides for the recovery of minimal damages without the necessity of proof, but only for those actions in which nominal damages are available.").

[12] *In re Age Refin., Inc.*, 801 F.3d 530, 538 (5th Cir. 2015).

No. 21-40718

on the defendant."[13]  Neither party contends the award could be upheld as restitution damages, and the parties have not pointed us to any evidence that the Aarons' improvements to Commerce Ranch conferred a benefit on Rose.

The damages award cannot be upheld as reliance damages. "[R]eliance damages compensate the plaintiff for out-of-pocket expenses."[14] They "reimburse one for expenditures made towards the execution of the contract in order to restore the status quo before the contract."[15] "The purpose of this measure of damages is to put the injured party in as good an economic position as it would have occupied had the contract not been made."[16]  Although the Aarons argued in the district court that the bankruptcy court's damages award constituted reliance damages, they do not repeat this argument in this court. Rightfully so. Their expenditures to improve Commerce Ranch were not "made towards the execution of the contract."[17]

---

[13] *Atrium Med. Ctr., LP v. Hou. Red C LLC*, 595 S.W.3d 188, 193 (Tex. 2020). *See generally City of Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 317-18 (Tex. App.—Austin 1992, no writ).

[14] *Atrium Med. Ctr.*, 595 S.W.3d at 193.

[15] *Sharifi*, 370 S.W.3d at 149 (citing *Foley v. Parlier*, 68 S.W.3d 870, 884-85 (Tex. App.—Fort Worth 2002, no pet.)).

[16] *Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 607-08 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *cf. Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 866 (5th Cir. 1999) ("Reliance damages seek to put the injured party in the position he would have been in had he not relied on the promise.").

[17] *See also Universal Truckload, Inc. v. Dalton Logistics, Inc.*, 946 F.3d 689, 697 (5th Cir. 2020) ("[R]eliance on a contract is not reasonable after the other party unequivocally repudiates its obligations." (emphasis omitted)); *Conner v. Lavaca Hosp. Dist.*, 267 F.3d 426, 436 (5th Cir. 2001) ("Any services provided after . . . repudiation cannot reasonably be said to have been in reliance on the [repudiated contract].").

No. 21-40718

Finally, the damages award cannot be upheld as expectation damages. "Expectancy damages award a contract plaintiff the benefit of its bargain."[18] "The purpose of this measure of damages is to restore the injured party to the economic position it would have occupied had the contract been performed."[19] "To restore an injured party to the position he would have been in had the contract been performed, it must be determined what additions to the injured party's wealth have been prevented by the breach and what subtractions from his wealth have been caused by it."[20] Further, "a party generally should be awarded neither less nor more than his actual damages."[21]

To begin, the Aarons have not pointed this court to where they advocated for an expectancy damages measure *at all* in the bankruptcy court.[22] In the district court, the Aarons argued that the award should be upheld as reliance damages. Notably, the Aarons argued in the district court that "[t]he bankruptcy court properly concluded that the particular facts of this case and the specific nature of the breach and harm incurred did not

---

[18] *Atrium Med. Ctr.*, 595 S.W.3d at 193.

[19] *Parkway Dental Assocs.*, 391 S.W.3d at 607; *see also Clear Lake City Water Auth. v. Friendswood Dev. Co.*, 344 S.W.3d 514, 523-24 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

[20] *Sharifi*, 370 S.W.3d at 149 (quoting *Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 187 (Tex. App.—Austin 1998, pet. denied)); *see also Abraxas Petrol. Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.) ("A party's expectation interest is measured by his anticipated receipts and losses caused by the breach less any cost or other loss he has avoided by not having to perform.").

[21] *Sharifi*, 370 S.W.3d at 148 (citing *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952)).

[22] *See In re Mandel*, 578 F. App'x 376, 390-91 (5th Cir. 2014) (vacating and remanding damages award where "the bankruptcy court awarded a damages figure that d[id] not appear to be based on any of the damages models presented").

warrant crediting Rose for rent payments the Aarons did not pay." Now, in this court, the Aarons assert that the bankruptcy court did "account for the amount in lease payments that the Aarons were not required to make." They do not explain how this calculation was made, and the record does not reflect such a determination.

More importantly, despite Texas law, the bankruptcy court did not determine the difference between (1) the amount by which the Aarons benefited from Rose's breach and (2) the amount by which they were harmed by the breach. Rather, the only harm the bankruptcy court quantified was the cost of improving Commerce Ranch, and the court awarded that amount as damages. On its own, that figure leaves the Aarons in a better economic position because they saved more on rent payments than they paid in improvements to Commerce Ranch. That award is not an expectancy measure.

Although the bankruptcy court cited other harms the Aarons suffered, such as the lost opportunity to put the repurposed Commerce Ranch to use for other business, the bankruptcy court neither quantified these other harms nor determined whether the total harms exceeded, equaled, or were less than the cost of the lease payments, maintenance, utilities, and insurance. Accordingly, there is no way for this court to determine whether the award of $1,109,000, when compared to those savings, puts the Aarons in a better, equal, or worse position than if the contract had been performed. Expectancy damages aim to "restore the injured party to the economic position it would have occupied had the contract been performed."[23] An award cannot be upheld as expectancy damages if, as is the case here, it is ambiguous in

---

[23] *Parkway Dental Assocs*, 391 S.W.3d at 607.

whether it restores the injured party to a better, equal, or lesser economic position than had the contract been performed.[24]

The Aarons argue that the bankruptcy court properly accounted for other losses and did not need to "itemize each subsidiary component" of their loss. It is true that the record need "not show a specific . . . calculation by the trial court."[25] However, there must be "evidence in the record to support" a particular damages award.[26] "The fact-finder has the discretion to award damages within the range of evidence presented at trial, *so long as a rational basis exists for its calculation.*"[27] The Aarons contend that the record as a whole supports the harms the bankruptcy court cited, as well as several other harms, including the loss of Rose's consulting services, the lost association with her brand, and the loss of the "valuable" and "prominent" location of Gainesville Ranch. Even assuming the record may support that the Aarons lost out on these benefits, they have not pointed to anywhere in the record indicating they provided evidence at trial as to the economic value of such losses. There are no "objective facts, figures, or data" establishing the amounts of loss.[28] Instead, we are left only to speculate what they are worth—and therefore whether the damages award leaves the Aarons in a

---

[24] *Cf. Transitional Entity LP v. Elder Care LP*, No. 05-14-01615-CV, 2016 WL 3197160, at *7-8 (Tex. App.—Dallas May 27, 2016, no pet.) (rejecting damages award that did "not conform to the 'benefit of the bargain' measure of damages" because it did not "put the plaintiff in the same position as if the contract had been performed").

[25] *Sharifi*, 370 S.W.3d at 151.

[26] *Id.*

[27] *Id.* (emphasis added).

[28] *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001); *see also Sanders v. Flanders*, 564 F. App'x 742, 745-46 (5th Cir. 2014) (holding there was insufficient evidence to establish damages because the plaintiff "provided no accompanying figures, data, or explanation as to how he calculated this amount of damages").

better, equal, or lesser economic position than had the contract been performed.

The Aarons state that they previously ran a horse and cattle business at Commerce Ranch. The bankruptcy court stated that the Aarons' loss of the use of Commerce Ranch for other purposes is part of what offset the "$2.5 million over its five-year term for the use of Gainesville Ranch as well as maintenance, utilities and insurance." However, the Aarons did not proffer evidence at trial that would have allowed the bankruptcy court to calculate lost profits with reasonable certainty, and Texas law includes specific requirements which were not met here for what must be proven when seeking damages for lost profits.[29] A damages award cannot be upheld when the evidence is insufficient.[30]

Finally, the Aarons incorrectly claim that the damages award can survive because it may be a conservative estimate. As noted, trial courts have "discretion to award damages 'within the range of evidence' introduced at trial," but this principle "cannot be applied if the plaintiff 'offered no

---

[29] *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992) ("Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." (citations omitted)); *Sharifi*, 370 S.W.3d at 150 ("Further, '[i]n proving a claim of "lost profits," if the business was not created by the contract in question then its profitability should be measured by the years preceding the breach.'" (alteration in original) (quoting *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex. App.—Dallas 1988), *writ denied*, 778 S.W.2d 865 (Tex. 1989)).

[30] *See Great Pines Water Co. v. Liqui-Box Corp.*, 203 F.3d 920, 925 (5th Cir. 2000) (vacating and remanding damages award where "the evidence [was] insufficient to support loss of profits" and this court could not determine "whether the jury awarded sums for lost profits").

No. 21-40718

evidence to furnish a range within which a [factfinder] could exercise its discretion to award damages in the first place.'"[31]  We rejected an argument similar to the Aarons' argument in *Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.*[32]  In that breach-of-contract case, this court held that a damages award could not be upheld because the district court failed to apply a "correct methodology" to "calculat[e] the expectation damages."[33]  The party supporting the damages award argued that "[i]f anything, the award was conservative."[34]  Nevertheless, this court vacated the award.[35]  The Aarons' argument that the $1.1 million damages award was conservative in that it "only remedied one part of [their] loss" is similarly unavailing.  A damages award cannot be upheld if it is not based on a legally cognizable methodology.[36]

## D

Although the Aarons ask us to remand to the bankruptcy court to clarify its analysis or for further fact finding, such a remand is not warranted here.  Remand to allow the trial court to further explain its process is proper where the trial court does not "lay out enough subsidiary findings to allow us to glean 'a clear understanding of the analytical process by which [the]

---

[31] *Saulsberry v. Ross*, 485 S.W.3d 35, 52 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (alteration in original) (quoting *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566-67 (Tex. 2002)).

[32] 919 F.3d 931 (5th Cir. 2019).

[33] *Id.* at 941-42.

[34] Brief for Appellee at 56, *Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931 (5th Cir. 2019) (No. 18-20115), 2018 WL 4075980.

[35] *Eni*, 919 F.3d at 941-42.

[36] *See id.*; *see also Int'l Harvester Co. v. Kesey*, 507 S.W.2d 195, 196-97 (Tex. 1974) (reversing and remanding damages award where witness testified to a "conservative estimate," but the plaintiff did not establish their losses with reasonable certainty).

ultimate findings were reached and to assure us that the trial court took care in ascertaining the facts."[37] Similarly, remand for additional fact finding such as an evidentiary hearing on damages may be appropriate when the plaintiffs have proven that they suffered "some damage" but the trial court does not adequately explain "the evidentiary and legal basis for the damages awarded."[38] Neither situation applies here.

As described above, in *Eni* the bankruptcy court failed to apply a plausible monthly payment rate had the defendant not breached the contract.[39] Accordingly, this court "vacate[d] the damages award and remand[ed] with instructions to recalculate the damages using the correct methodology."[40] Here, by contrast, the error is not solely in the trial court's calculation. Rather, the Aarons failed to pursue and prove a damages measure that could be upheld under Texas law.

In *In re Mandel*,[41] an unpublished decision about misappropriation of trade secrets, the plaintiffs "offered a number of damage theories in the bankruptcy court."[42] Although the bankruptcy court rejected all of

---

[37] *Id.* at 936 (alteration in original) (quoting *Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 433 (5th Cir. 1977)); *see also Lebron v. United States*, 279 F.3d 321, 329 (5th Cir. 2002) (remanding damages award where it was unclear whether the total award "duplicated" some harms).

[38] *In re Mandel*, 578 F. App'x 376, 391 (5th Cir. 2014); *see also Davis v. Safeway Stores, Inc.*, 532 F.2d 489, 491 (5th Cir. 1976) (remanding for new trial to partially redetermine damages unless plaintiff agreed to remittitur where plaintiff proved some damages but there was insufficient evidence to support the full award).

[39] *Eni*, 919 F.3d at 942 ("What is clear, though, is applying the Standby Rate simply because Eni never issued any instructions after repudiation missed the mark.").

[40] *Id.*

[41] 578 F. App'x 376 (5th Cir. 2014).

[42] *Id.* at 379, 389.

plaintiffs' damages theories, it awarded some damages "without explaining the theory on which it relied or identifying the evidence that supported these awards."[43]  The bankruptcy court expressly concluded that plaintiffs "were damaged by the conduct of" the defendant.[44]  This court stated that because the plaintiffs "did suffer some damage, we vacate the award of compensatory damages and remand to the bankruptcy court so that it may either conduct an additional evidentiary hearing on the issue of damages or explain its award of damages on the basis of the evidence in the present record."[45]

Unlike in *In re Mandel*, the Aarons have not sufficiently proven that they suffered "some damage" because they failed to proffer legally sufficient evidence at trial.  The Aarons failed to provide evidence, as would be required for expectation damages, that their harms from the breach exceeded their gains.  No award could be upheld under the present record.

Plaintiffs are "not entitled to relitigate the issue of damages" when they "had adequate opportunity to present sufficient evidence as to damages" and "did not do so."[46]  The Aarons had their opportunity to present sufficient evidence during the nine-day trial.  They failed to do so.

While there is possible ambiguity in the district court's remand "for further consideration," both parties agreed at oral argument that the remand

---

[43] *Id.* at 389.

[44] *Id.*

[45] *Id.* at 391.

[46] *In re Letterman Bros. Energy Sec. Litig.*, 799 F.2d 967, 974 (5th Cir. 1986); *see also Great Pines Water Co. v. Liqui-Box Corp.*, 203 F.3d 920, 925 (5th Cir. 2000) ("Great Pines had a full opportunity to establish its claim for lost profits and consequential damages; however, having failed to do so, it may not retry its claim for these damages.").

was only for a ministerial entry of judgment.  The bankruptcy court should treat the remand as such.

\* \* \*

Because the Aarons did not proffer the evidence required for a legally cognizable damages model under Texas law, we need not reach the questions of whether the evidence that is in the record was credible, whether the quantity of the damages award was reasonable, or whether the Aarons' payments through their partnership entity affected their ability to recover. We affirm the district court's judgment on this claim.

## III

Rose and the Aarons dispute the bankruptcy court's conclusion that Rose violated the Texas Theft Liability Act (TTLA).  The district court reversed.  We agree with the bankruptcy court that Rose appropriated the Aarons' property by threatening to commit an offense—namely, by threatening to retain the Aarons' horses even after she no longer would have had any right to do so.

## A

The TTLA provides that "[a] person who commits theft is liable for the damages resulting from the theft."[47]  To define "theft," the TTLA incorporates several sections of the Texas Penal Code by reference.[48]  The parties agree that here the relevant incorporated Texas Penal Code section is § 31.03.  Section 31.03 provides that "[a] person commits an offense if he

---

[47] Tex. Civ. Prac. & Rem. Code § 134.003(a); *see also McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 906 (Tex. App.—Dallas 2014, pet. denied).

[48] *See* Tex. Civ. Prac. & Rem. Code § 134.002(2).

unlawfully appropriates property with intent to deprive the owner of property."[49] An "[a]ppropriation of property is unlawful if," among other things, "it is without the owner's effective consent."[50] "Consent is not effective if" it is "induced by deception or coercion."[51] One definition in the Texas Penal Code for "coercion" is "a threat, however communicated . . . to commit an offense."[52] Although the Texas Penal Code provides additional definitions for coercion, the parties debate only this definition, and the district court likewise considered only this definition. We do the same. The relevant question here, then, is whether Rose unlawfully appropriated the Aarons' property by inducing their consent through coercion—that is, by threatening to commit an offense. We review this question de novo.[53]

The bankruptcy court determined that Rose violated the TTLA when she asserted a stable keeper's lien against the Aarons' horses. Under Texas law, "[a] stable keeper with whom an animal is left for care has a lien on the animal for the amount of the charges for the care."[54] This lien attaches "while the customer's" animal "is in the possession of the" stable keeper.[55] Accordingly, a stable keeper "may retain possession of the [animal] until the

---

[49] TEX. PENAL CODE § 31.03(a).

[50] *Id.* § 31.03(b)(1).

[51] *Id.* § 31.01(3)(A).

[52] *Id.* § 1.07(a)(9)(A); *see also Evans v. State*, 220 S.W.3d 54, 56 (Tex. App.—San Antonio 2006, pet. ref'd) (relying on the definition of coercion in § 1.07(a)(9) in connection with § 31.03).

[53] *See In re Soileau*, 488 F.3d 302, 305 (5th Cir. 2007).

[54] TEX. PROP. CODE § 70.003(a).

[55] *Mossman v. Banatex, LLC*, 479 S.W.3d 854, 860 (Tex. App.—El Paso 2015, no pet.).

amount due under the contract for [its care] has been paid."[56]  Rose asserted a stable keeper's lien against the Aarons' horses for $101,948.50 even though the charges for their care were only $40,691.18.  According to Rose, the additional $61,257.32 reflected other charges owed under the August 2023 lease and consulting agreements.  The Aarons paid the full amount that Rose demanded and retrieved their horses.

The bankruptcy court concluded that "Rose violated the TTLA and coerced payment by depriving the Aarons of their horses until they agreed to pay her everything she demanded."  The court stated:

> [Rose] did not deceive the Aarons as to the fact that she was demanding $61,257.32 over-and-above the amounts related to the care and grazing of their horses, but she coerced them to pay the full amount she believed she was owed under the Agreements by refusing to release their horses from the Gainesville Ranch.

Although the bankruptcy court stated the statutory definition of "deception," it did not state the statutory definition of "coercion."

The district court reversed, finding (1) the bankruptcy court did not apply the statutory definition of coercion, (2) Rose's retention of the horses was not an "offense" under the statutory definition of coercion because Rose could legally retain the horses until the Aarons paid $40,691.18, (3) the bankruptcy court did not make the requisite findings of Rose's intent, (4) the Aarons did not produce evidence that Rose did not have the requisite intent, and (5) the bankruptcy court did not make the requisite findings of causation.

---

[56] *See id.* (recognizing a similarity between § 70.001 liens and § 70.003 liens).

No. 21-40718

**B**

As discussed, the question here is whether Rose coerced payment by threatening "to commit an offense."[57] We are satisfied that Rose threatened "to commit an offense" by threatening to retain the horses until the Aarons paid the full $101,948.50. Rose held a statutory possessory lien in the Aarons' horses worth $40,691.18.[58] "A 'possessory lien' is a type of claim or security interest in specific property that permits a creditor to take and retain possession of the property *until a debt or obligation is satisfied*."[59] A statutory possessory lien "ceases to exist and can no longer entitle [a lienholder] to possession" after the "debt is discharged."[60] "[T]he satisfaction of a debt automatically extinguishes a lien securing that debt."[61]

Rose cites no law giving her a right to continue possessing the Aarons' horses after they paid the $40,691.18 debt for Rose's care of their horses. At that point, Rose would have been legally required to return the horses to the

---

[57] Tex. Penal Code § 1.07(a)(9)(A).

[58] *See* Tex. Prop. Code § 70.003(a).

[59] *Green Tree Servicing, LLC v. 1997 Circle N Ranch Ltd.*, 325 S.W.3d 869, 873 (Tex. App.—Austin 2010, no pet.) (emphasis added) (citing *Possessory Lien*, Black's Law Dictionary (9th ed. 2009)); *see also Possessory Lien*, Black's Law Dictionary (12th ed. 2024) ("A lien allowing the creditor to keep possession of the encumbered property *until the debt is satisfied*." (emphasis added)).

[60] *See Seureau v. Mudd*, 515 S.W.2d 746, 748-49 (Tex. App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.) ("[H]is debt is discharged by the offset. Contemporaneous with this discharge, the lien . . . ceases to exist and can no longer entitle [the lienholder] to possession."); *see also Caress v. Lira*, 330 S.W.3d 363, 366 (Tex. App.—San Antonio 2010, pet. denied) ("A lien is usually extinguished upon payment of the indebtedness that it was created to secure."); *Jarvis v. K&E Re One, LLC*, 390 S.W.3d 631, 642 (Tex. App.—Dallas 2012, no pet.) ("The payment of a debt discharges the lien securing it without any release from the lienholder.").

[61] *Acme Energy Servs., Inc. v. Staley*, 569 S.W.3d 831, 838 (Tex. App.—El Paso 2019, no pet.).

Aarons.[62]  But she threatened to retain them until the Aarons paid more than they owed.  This was a threat to commit criminal theft of the Aarons' horses.  Rose threatened to "unlawfully appropriate[]" the Aarons' horses without their "effective consent."[63]  That is, she threatened to unlawfully "exercise control" over the horses.[64]

The district court concluded otherwise, reasoning that "[i]t was legally permissible for Rose to retain possession of the horses until the Aarons paid her $40,691.18. . . . Therefore, Rose did not threaten to commit an offense—retention of the horses—because she had a legal right to possess the horses at the time."  The district court also stated that "[t]he calculus might be different if the Aarons had paid Rose the amount she was legally owed for the care of the horses in her possession, $40,691.18, and she then continued to threaten to keep the horses if the Aarons refused to pay the remaining $61,267.32."  With great respect to the able district court, the fact that Rose was not presently committing an offense "at the time" by retaining possession of the horses says nothing about whether Rose threatened to commit an offense by retaining the horses even after her legal basis for doing so had ceased.  Although Rose did not keep the horses beyond the point at which the stable keeper's lien was no longer valid, this has no bearing on whether she made the threat to do so.  Similarly, Rose argues that she "had the absolute right to possess the horses under a valid stableman's lien."  But that present right would "automatically" extinguish once the Aarons paid

---

[62] *Cf. Comerica Acceptance Corp. v. Dall. Cent. Appraisal Dist.*, 52 S.W.3d 495, 498 (Tex. App.—Dallas 2001, pet. denied) (noting for purposes of different Texas statute that "if the lienholder in possession receives payment of the remaining amounts owed against the property, the lienholder must relinquish possession of the property to the record owner").

[63] TEX. PENAL CODE § 31.03(a)-(b).

[64] *Id.* § 31.01(4)(B) (defining "Appropriate").

the correct debt,[65] and the Aarons argue that Rose's threat to unlawfully retain the horses until they paid even more coerced them into paying the balance.

## C

The Aarons also must show that Rose's threat to commit an offense "induced" them to pay the extra \$61,267.32 and that Rose acted "with intent to deprive" them of that money.[66] Under the TTLA, "[t]he relevant 'intent to deprive' is the person's intent at the time of the taking."[67] "Intent is typically proven through circumstantial evidence and may be inferred from [the alleged thief's] acts, words, and conduct."[68] "[E]vidence of actual deprivation may be evidence of intent to deprive."[69]

The bankruptcy court did not make any explicit findings regarding inducement or intent. The district court held that the Aarons did not produce any evidence "supporting causation" or "suggesting that Rose had an intent to deprive the Aarons of \$61,267.32."

With great respect to the district court, we disagree. In our view, the record evidence is disputed. The bankruptcy court found that "Rose testified, credibly, that she is not an 'office person'" and that Rose "relied

---

[65] *See Acme Energy Servs.*, 569 S.W.3d at 838.

[66] Tex. Penal Code §§ 31.01(3)(A), 31.03(a); *see also State v. Fuller*, 480 S.W.3d 812, 822 nn.11-12 (Tex. App.—Texarkana 2015, pet. ref'd) (defining "intent" and "deprive").

[67] *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 906 (Tex. App.—Dallas 2014, pet. denied) (citing *Wirth v. State*, 361 S.W.3d 694, 697 (Tex. Crim. App. 2012)).

[68] *Fuller*, 480 S.W.3d at 823 (citation omitted).

[69] *Id.* at 822 (quoting *Rowland v. State*, 744 S.W.2d 610, 612 (Tex. Crim. App. 1988)).

on others to keep the books and records for her business." Rose claims that "the inclusion of the excess charges was accidental" and that her "attorneys decided" what charges should be included in the stable keeper's lien. Rose further contends that the Aarons "voluntarily paid" the excess charges and made no "specific[]" protest against them.[70] Importantly, according to Rose, the Aarons validly owed these additional expenses to Rose under other contracts, save for "minor duplicate charges."

However, the Aarons point out that Rose also testified that both she *and* her attorneys "looked at" the stable keeper's lien charges. Further, Rose testified that certain expenses did not reflect what she "would charge a regular customer" to board horses at her ranch. The bankruptcy court found that these charges included "the cost of utilities for the whole Ranch" and "feed for all the horses under the Ranch's care." Lori Aaron testified that she paid "under full protest" and that she would characterize Rose's demand as "[e]xtortion."

"[U]nder Texas law, '[i]ntent is a fact question uniquely within the realm of the trier of fact.'"[71] The bankruptcy court is best positioned to undertake assessments of witness credibility. "Accordingly, we must remand this case to the district court (and thence to the bankruptcy court) for additional fact finding" based on the existing record.[72] The parties are not limited to the evidentiary arguments outlined above.

---

[70] *See Hughes v. Montee*, No. 05-15-00129-CV, 2016 WL 3946887, at *4 (Tex. App.—Dallas July 18, 2016, pet. denied) (mem. op.) ("A voluntary transfer cannot be theft under the [TTLA].").

[71] *In re Ritz*, 832 F.3d 560, 569 (5th Cir. 2016) (second alteration in original) (quoting *Flores v. Robinson Roofing & Constr. Co.*, 161 S.W.3d 750, 754 (Tex. App.—Fort Worth 2005, pet. denied)).

[72] *Id.*

\* \* \*

In sum, Rose threatened to "commit an offense" such that she can be held liable under the TTLA. However, the bankruptcy court did not make sufficient findings for us to review the other issues related to this claim, so the district court should remand to the bankruptcy court for further fact finding on the existing record.

## IV

Rose and McLaughlin dispute the bankruptcy court's judgment for McLaughlin on his $51,200 claim for the diminution in value of two fillies. We agree with the district court that the award must be reversed because the testimony McLaughlin provided to quantify his damages was legally insufficient under Texas law.

When personal property is partially destroyed, "[t]he default rule for measuring direct damages is 'the difference in the market value immediately before and immediately after the injury to such property.'"[73] Accordingly, a plaintiff must provide evidence of the market value of the property both before and after the injury.[74] "Market value is 'the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying.'"[75]

---

[73] *J & D Towing, LLC v. Am. Alt. Ins. Corp.*, 478 S.W.3d 649, 656 (Tex. 2016) (quoting *Pasadena State Bank v. Isaac*, 228 S.W.2d 127, 128 (Tex. 1950)).

[74] *See Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 155, 160-61 (Tex. 2012) (evaluating evidence presented regarding both pre- and post-damage market value).

[75] *City of Harlingen v. Est. of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001) (quoting *State v. Carpenter*, 89 S.W.2d 979, 980 (Tex. [Comm'n Op.] 1936)).

No. 21-40718

Under Texas's Property Owner Rule, "[a] property owner may testify to the value of his property."[76] However, "a property owner's testimony must be based on market, rather than intrinsic or some other speculative value of the property."[77] "[T]his requirement is usually met by asking the witness if he is familiar with the market value of his property."[78] "[W]hile the Property Owner Rule establishes that an owner is *qualified* to testify to property value," Texas courts "insist that the testimony meet the 'same requirements as any other opinion evidence.'"[79] "'[I]t is the *basis of the witness's opinion*, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law."[80] "An owner may not simply echo the phrase 'market value' and state a number to substantiate his diminished value claim; he must provide the factual basis on which his opinion rests."[81] However, "[t]his burden is not onerous," and "[e]vidence of price paid, nearby sales, tax valuations, appraisals, online resources, and any other relevant factors may be offered to support the claim."[82] But "an owner's conclusory or speculative testimony will not support a

---

[76] *Justiss*, 397 S.W.3d at 155.

[77] *Id.*

[78] *Id.* at 155-56 (quoting *Porras v. Craig*, 675 S.W.2d 503, 505 (Tex. 1984), *abrogated on other grounds by, Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474 (Tex. 2014)).

[79] *Id.* at 156 (quoting *Porras*, 675 S.W.2d at 504).

[80] *Id.* (quoting *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004)).

[81] *Id.* at 159.

[82] *Id.*

No. 21-40718

judgment"[83]—"even if unchallenged."[84]  We review legal sufficiency de novo.[85]

In the bankruptcy court, McLaughlin submitted a proof of claim against the Rose bankruptcy estate in the amount of $51,200.  McLaughlin alleged that "Rose ha[d] failed and refused to sign the breeder certificates necessary to register two fillies sired by" one of Rose's horses—A Shiner Named Sioux—which reduced the fillies' value.  At trial, McLaughlin testified about his basis for the $51,200 damages number:

> Q.    . . . That number 51,200.  How did you arrive at that number?
>
> A.    I have two unregistered, A Shiner Named Sioux fillies. One is 5 years old, I believe, and one is 4 years old that Carol wouldn't sign the breeder certificates on.
>
> Q.    And what value do the horses have, if they have the breeder's certificates?
>
> A.    I sold the foal sibling for 25,000 and another foal sibling for 25,000. So why wouldn't they be worth it?
>
> Q.    But you were unable to sell these two horses because Ms. Rose refused to give you the registration certificates; is that what I understand your testimony to be?
>
> A.    They're worth 500 bucks as a [recip[86]] mare now.

---

[83] *Id.* at 158.

[84] *Id.* at 159.

[85] *See In re Soileau*, 488 F.3d 302, 305 (5th Cir. 2007).

[86] The trial transcript states "reset" instead of "recip."  According to McLaughlin, this is a transcription error.  Recipient (recip) mares "act as surrogate mothers for Quarter Horse embryos."  *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 325 (5th Cir. 2015).

Q.    Why is that?

A.    Well, they have no papers on them. I can't breed them
      to a stallion like Blindsided, or anything like that, to try
      to get any money out of them because their colts
      wouldn't be registerable.

The bankruptcy court found that McLaughlin's "testimony was credible and sufficient to establish his damages," especially since "Rose did not submit any evidence contradicting his testimony." Additionally, it concluded that "the evidence at trial establishes that registration papers are integral to the value of Rose's horses and their progeny and that Rose has charged extremely high prices for many of the horses sired by" A Shiner Named Sioux. The court thus "conclude[d] that McLaughlin established an unsecured claim against Rose in the amount of $51,200." Rose appealed the damages award to the district court. The district court concluded the bankruptcy court had erred because "McLaughlin's vague and speculative testimony does not establish the market value of the fillies before or after the breach."

We agree with the district court that McLaughlin's testimony does not establish the fillies' (post-breach) market value without the breeder certificates from Rose. Although McLaughlin generally explained why the value of the fillies without the certificates is lower than with the certificates, he did not explain why that lower value *was $500*. While his "burden is not onerous,"[87] McLaughlin needed to provide *some* support for why $500, rather than some other reduced value, was the correct value of the fillies without papers. He could have done so with, for example, evidence that the fillies had no value as pleasure or performance horses, that their *only* value was as recipient mares, and of the price he paid for other recipient mares, the

---

[87] *Justiss*, 397 S.W.3d at 159.

price at which nearby recipient mares sold, tax evaluations, or an appraisal.[88] But McLaughlin "never explained how [he] arrived at [the $500] figure[]."[89] In his reply brief in this court, McLaughlin argues that "his experience with prior sales and as a horse breeder" is a "factual basis" for his testimony that the fillies are worth $500 without a certificate. Although this experience may "demonstrate[] his familiarity with area market values," McLaughlin "fail[s] to explain the factual basis behind his determination that" the fillies have a market value of $500 without the certificates.

We vacate the district court's judgment on this claim and remand for further proceedings.

## V

The bankruptcy court awarded the Aarons their reasonable attorneys' fees and costs pursuant to Texas Civil Practice and Remedies Code §§ 38.001 and 134.005. Rose separately appealed the fee award to the district court. Because the district court reversed the bankruptcy court's judgment in favor of the Aarons, the district court also vacated the fee award, reasoning that the Aarons "may not be deemed the prevailing parties after reconsideration by the bankruptcy court." The Aarons ask us in their brief to reinstate that award or to remand to the district court to address the merits of the award, although they stated at oral argument that because "the district

---

[88] *See id.*; *cf. City of Harlingen v. Est. of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001) ("If the goal of an appraisal is to ascertain market value, then logically there can be no better guide than the prices that willing buyers and sellers actually negotiate in the relevant market. Under a comparable sales analysis, the appraiser finds data for sales of similar property, then makes upward or downward adjustments to these sales prices based on differences in the subject property.").

[89] *Justiss*, 397 S.W.3d at 161; *see also Juen v. Rodriguez*, 615 S.W.3d 362, 367 (Tex. App.—El Paso 2020, no pet.) (collecting cases that describe evidence establishing the requisite "factual substantiation").

court did not address [the award] substantively," ordinarily "the district court would review that in the first instance."

We do not address the attorneys' fees and costs. As discussed above, we affirm the district court's judgment as to the Aarons' breach of contract claim. We also reverse the district court's judgment as to the Aarons' TTLA claim. We therefore leave it to the bankruptcy court to assess whether the Aarons are prevailing parties on their TTLA claim after reassessment by the bankruptcy court.[90]

\*　　　\*　　　\*

We GRANT the Rose Parties' motion to dismiss their appeal of the district court's judgment in favor of the Weston Parties. We AFFIRM the district court's judgment reversing the bankruptcy court's judgment on the Aaron's breach of contract claim. We REVERSE the district court's judgment and REMAND regarding McLaughlin's unsecured claim. We REVERSE the district court's judgment reversing the bankruptcy court's judgment on the Aarons' TTLA claim and REMAND regarding that claim.

---

[90] *See Arthur J. Gallagher & Co. v. Babcock*, 703 F.3d 284, 296 (5th Cir. 2012) ("Because Plaintiffs were only partially successful in their defense of the judgment below, we decline to award fees at this juncture."); *9503 Middlex, Inc. v. Cont'l Motors, Inc.*, 834 F. App'x 865, 874 (5th Cir. 2020) ("Because the district court's order rested on the plaintiffs' success on several issues we reverse today, we vacate the order and remand to the district court for a reevaluation of reasonable attorneys' fees."); *cf. In re Pratt*, 524 F.3d 580, 584-85 (5th Cir. 2008) (holding court lacked jurisdiction to review district court's remand of bankruptcy court's attorneys' fee award because remand "require[d] the bankruptcy court to perform judicial functions").

No. 21-40718

ANDREW S. OLDHAM, *Circuit Judge*, concurring in part and dissenting in part:

I agree with the majority that the bankruptcy court correctly interpreted the Texas Theft Liability Act; Carol Rose unlawfully appropriated the Aarons' property by threatening to retain the Aarons' horses until they paid her $101,948.50. But I respectfully disagree with the majority's approach to the remaining claims. In my view, the bankruptcy court appropriately considered and resolved the claims on the available evidence. Even if the bankruptcy court didn't perfectly articulate its reasoning, we should remand for clarification or further factfinding. Under no circumstances is a take-nothing judgment appropriate in this case.